UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| | : | |
| v. | : | Mag. No. 19-4556 (LHG) |
| | : | |
| DAMION HELMES, | : | |
|     a/k/a "Checks"; | : | |
| DERRICK HAYES, | : | |
|     a/k/a "D-Flex," | : | |
|     a/k/a "Flex"; | : | |
| DEQUAN COPELAND, | : | |
|     a/k/a "Just"; | : | |
| DAWN STEPHENS; | : | |
| SHANTAY WALKER, | : | |
|     a/k/a "Tay"; | : | |
| KEITH LOGAN, | : | |
|     a/k/a "Beef"; | : | |
| SHAMAR DUDLEY, | : | |
|     a/k/a "I-True," | : | |
|     a/k/a "True," | : | |
|     a/k/a "Smacks"; | : | |
| CASSIUS WILLIAMS; | : | |
| TONYA UNDERWOOD; | : | |
| MICHELLE TORREZ; | : | |
| ELIZABETH CONOVER, | : | |
|     a/k/a "Betty"; | : | |
| CURTIS JENKINS; | : | |
| RALPH LEE; | : | |
| JERMAINE HICKS, | : | |
|     a/k/a "Bird"; | : | |
| SKYLER ROGERS; | : | |
| TERRY HAUPT, | : | |
|     a/k/a "Y.O."; | : | |
| AMAD JONES, | : | |
|     a/k/a "Ahmad Jones," | : | |
|     a/k/a "Mad"; | : | |
| ERIC YARBROUGH; | : | |
| RONDELL HILL, | : | |
|     a/k/a "Blizz"; and | : | |
| MALCOLM GATSON. | : | |

I, Michael Hetherington, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.  On or about the dates set forth in Attachment A to this complaint, in the District of New Jersey and elsewhere:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

MICHAEL HETHERINGTON
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE
AUGUST 21, 2019
TRENTON, NEW JERSEY

HON. LOIS H. GOODMAN
UNITED STATES MAGISTRATE JUDGE

2

ATTACHMENT A

Count One
(Conspiracy - Cocaine)

From at least in or around April 2019 through in or around August 2019, in Monmouth County, Middlesex County, and Ocean County, in the District of New Jersey and elsewhere, the defendants,

DAMION HELMES, a/k/a "Checks";
DERRICK HAYES, a/k/a "D-Flex," a/k/a "Flex";
DEQUAN COPELAND, a/k/a "Just";
DAWN STEPHENS;
SHANTAY WALKER, a/k/a "Tay";
KEITH LOGAN, a/k/a "Beef";
SHAMAR DUDLEY, a/k/a "I-True," a/k/a "True," a/k/a "Smacks";
CASSIUS WILLIAMS;
TONYA UNDERWOOD;
MICHELLE TORREZ;
ELIZABETH CONOVER, a/k/a "Betty";
CURTIS JENKINS;
RALPH LEE;
JERMAINE HICKS, a/k/a "Bird";
SKYLER ROGERS;
TERRY HAUPT, a/k/a "Y.O.";
AMAD JONES, a/k/a "Ahmad Jones," a/k/a "Mad";
ERIC YARBROUGH;
RONDELL HILL, a/k/a "Blizz"; and
MALCOLM GATSON,

did knowingly and intentionally conspire with each other and others to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

<u>Count Two</u>

(Conspiracy – Crack Cocaine)

From at least in or around April 2019 through in or around August 2019, in Monmouth County and Middlesex County, in the District of New Jersey and elsewhere, the defendants,

DAMION HELMES, a/k/a "Checks";
DAWN STEPHENS;
SHANTAY WALKER, a/k/a "Tay";
KEITH LOGAN, a/k/a "Beef";
SHAMAR DUDLEY, a/k/a "I-True," a/k/a "True," a/k/a "Smacks";
TONYA UNDERWOOD;
MICHELLE TORREZ;
ELIZABETH CONOVER, a/k/a "Betty";
CURTIS JENKINS;
RALPH LEE;
SKYLER ROGERS;
ERIC YARBROUGH; and
RONDELL HILL, a/k/a "Blizz";

did knowingly and intentionally conspire with each other and others known and unknown to distribute and possess with intent to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

ATTACHMENT B

I, Michael Hetherington, am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2017. I have been involved personally in the investigation of this matter. The information contained in this complaint is based on my personal knowledge and on information obtained from other sources, including: (i) statements made or reported by various witnesses with knowledge of relevant facts; (ii) my review of documents and evidence obtained through court orders, subpoenas, and other sources; (iii) assistance provided to law enforcement by multiple confidential sources of information deemed credible and reliable; and (iv) my review of wire and electronic communications intercepted pursuant to court-authorized wiretaps. Because this complaint is submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in sum and substance and in part, and the statements set forth herein are based on preliminary summaries and quotations of those communications.

## I.   BACKGROUND

1.   From at least as early as in or around April 2019 to the present, the above-captioned defendants, and others known and unknown, combined, conspired, and agreed to distribute and possess with intent to distribute controlled substances, including at least 500 grams of cocaine and at least 280 grams of crack cocaine, in and around Monmouth County, New Jersey and beyond.

2.   Multiple confidential sources of information assisted law enforcement during this investigation, including by conducting more than a dozen controlled purchases of cocaine from defendant DAMION HELMES and others acting on HELMES' behalf. The information and assistance provided during the investigation by the confidential sources has been corroborated through other evidence law enforcement has obtained, including court-authorized wiretaps, physical surveillance, and consensually recorded calls and meetings.

3.   In furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to obtain—and did obtain—significant quantities of cocaine and other controlled substances. Also in furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to distribute—and did distribute—those narcotics, for profit, to other co-conspirators, various dealers, sub-dealers, and end users in and around Monmouth County and elsewhere.

4.   At all times relevant to this complaint:

a.    DAMION HELMES, a/k/a "Checks," was a leading member of the drug-trafficking conspiracy who obtained significant quantities of cocaine from defendants DERRICK HAYES and DEQUAN COPELAND, and re-distributed that cocaine, often after converting portions of it into crack cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.  HELMES used numerous telephone facilities (collectively, the "HELMES Facilities") to communicate in furtherance of the conspiracy, including but not limited to:

| Name | Beginning date (approx.) | Ending date (approx.) |
|------|--------------------------|-----------------------|
| HELMES 2942 Facility[1] | 7/10/2018 | 9/4/2019 |
| HELMES 8049 Facility | 9/5/2018 | 10/17/2018 |
| HELMES 6870 Facility | 10/18/2018 | 1/14/2019 |
| HELMES 5978 Facility | 1/15/2019 | 3/31/2019 |
| HELMES 5706 Facility | 4/2/2018 | 6/12/2019 |
| HELMES 4342 Facility | 6/12/2019 | 8/10/2019 |

b.    DERRICK HAYES, a/k/a "D-Flex," a/k/a "Flex," was a principal member of the drug-trafficking conspiracy who supplied large quantities of cocaine to HELMES for further distribution.  HAYES used a telephone facility ending in 2450 (the "HAYES 2450 Facility") to communicate in furtherance of the conspiracy.

c.    DEQUAN COPELAND, a/k/a "Just," was a principal member of the drug-trafficking conspiracy who supplied large quantities of cocaine to HELMES for further distribution.  COPELAND used numerous telephone facilities (collectively, the "COPELAND Facilities") to communicate in furtherance of the conspiracy, including but not limited to:

| Name | Beginning date (approx.) | Ending date (approx.) |
|------|--------------------------|-----------------------|
| COPELAND 9900 Facility | 5/23/2019 | 6/1/2019 |
| COPELAND 8151 Facility | 6/1/2019 | 6/12/2019 |
| COPELAND 3792 Facility | 7/5/2019 | 7/15/2019 |
| COPELAND 9900 Facility | 7/17/2019 | 7/25/2018 |

d.    DAWN STEPHENS, was a principal member of the drug-trafficking conspiracy who obtained significant quantities of cocaine and crack cocaine from HELMES, and re-distributed that crack cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end

---

[1] Each HELMES Facility is referred to by the last four digits of the telephone number HELMES used.

users.  STEPHENS used a telephone facility ending in 9236 (the "STEPHENS 9236 Facility") to communicate in furtherance of the conspiracy.

     e.    SHANTAY WALKER, a/k/a "Tay," was a principal member of the drug-trafficking conspiracy who obtained significant quantities of cocaine and crack cocaine from HELMES, and re-distributed that cocaine and crack cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.  WALKER used a telephone facility ending in 5418 (the "WALKER 5418 Facility") to communicate in furtherance of the conspiracy.

     f.    KEITH LOGAN, a/k/a "Beef," was a member of the drug-trafficking conspiracy who purchased crack cocaine from HELMES for further distribution.  LOGAN used at least two telephone facilities, one ending in 4598 (the "LOGAN 4598 Facility") and the other ending in 8887 subscribed to "Shamar Du" (the "DUDLEY 8887 Facility"), to communicate in furtherance of the conspiracy.

     g.    SHAMAR DUDLEY, a/k/a "I-True," a/k/a "True," a/k/a "Smacks," was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  DUDLEY used at least two telephone facilities, one ending in 8887 (the "DUDLEY 8887 Facility") and the other ending in 5869 (the "DUDLEY 5869 Facility"), to communicate in furtherance of the conspiracy.

     h.    CASSIUS WILLIAMS was a member of the drug-trafficking conspiracy who purchased cocaine or crack cocaine from HELMES for further distribution.  WILLIAMS used a telephone facility ending in 8042 (the "WILLIAMS 8042 Facility") to communicate in furtherance of the conspiracy.

     i.    TONYA UNDERWOOD was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  UNDERWOOD used numerous telephone facilities (collectively, the "UNDERWOOD Facilities") to communicate in furtherance of the conspiracy, including but not limited to:

| Name | Beginning date (approx.) | Ending date (approx.) |
|---|---|---|
| UNDERWOOD 1994 Facility | 5/1/2019 | 5/21/2019 |
| UNDERWOOD 5895 Facility | 5/22/2011 | 6/7/2019 |
| UNDERWOOD 0597 Facility | 7/6/2019 | 8/8/2019 |
| UNDERWOOD 7371 Facility | 8/8/2018 | present |

j.      MICHELLE TORREZ was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  TORREZ used a telephone facility ending in 2311 (the "TORREZ 2311 Facility") to communicate in furtherance of the conspiracy.

k.      ELIZABETH CONOVER, a/k/a "Betty," was a member of the drug-trafficking conspiracy who purchased crack cocaine from HELMES for further distribution.  CONOVER used a telephone facility ending in 7558 (the "CONOVER 7558 Facility") to communicate in furtherance of the conspiracy.

l.      CURTIS JENKINS was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  JENKINS used a telephone facility ending in 7138 (the "JENKINS 7138 Facility") to communicate in furtherance of the conspiracy.

m.      RALPH LEE was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  LEE used numerous telephone facilities (collectively, the "LEE Facilities") to communicate in furtherance of the conspiracy, including but not limited to: a telephone facility ending in 6659 (the "LEE 6659 Facility"); a telephone facility ending in 3786 (the "LEE 3786 Facility"); a telephone facility ending in 1361 (the "LEE 1361 Facility"); and a telephone facility ending in 7558, subscribed to by CONOVER (the "CONOVER 7558 Facility").

n.      JERMAINE HICKS, a/k/a "Bird," was a member of the drug-trafficking conspiracy who purchased cocaine or crack cocaine from HELMES for further distribution.  HICKS used a telephone facility ending in 7376 (the "HICKS 7376 Facility") to communicate in furtherance of the conspiracy.

o.      SKYLER ROGERS was a member of the drug-trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  ROGERS used a telephone facility ending in 0591 (the "ROGERS 0591 Facility") to communicate in furtherance of the conspiracy.

p.      TERRY HAUPT, a/k/a "Y.O.," was a member of the drug-trafficking conspiracy who purchased cocaine or crack cocaine from HELMES for further distribution.  HAUPT used at least two telephone facilities, one ending in 1035 (the "HAUPT 1035 Facility"), and the other ending in 6729 (the "HAUPT 6729 Facility"), to communicate in furtherance of the conspiracy.

q.      AMAD JONES, a/k/a "Ahmad Jones," a/k/a "Mad," was a member of the drug-trafficking conspiracy who purchased cocaine or crack cocaine from HELMES for further distribution.  JONES used at least three telephone facilities to communicate in furtherance of conspiracy: one ending in 4363 (the JONES 4363 Facility"), one ending in 7665 (the "Jones 7665 Facility"), and one ending in 0236 (the "Jones 0236 Facility").

8

r.     ERIC YARBROUGH was a member of the drug trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution. YARBROUGH used at least two telephone facilities, one ending in 2170 (the "YARBROUGH 2170 Facility") and the other ending in 6880 (the "YARBROUGH 6880 Facility"), to communicate in furtherance of the conspiracy.

s.     RONDELL HILL was a member of the drug trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  HILL used a telephone facility ending in 7960 (the "HILL 7960 Facility") to communicate in furtherance of the conspiracy.

t.     MALCOLM GATSON was a member of the drug trafficking conspiracy who purchased cocaine and crack cocaine from HELMES for further distribution.  GATSON used a telephone facility ending in 8818 (the "GATSON 8818 Facility") to communicate in furtherance of the conspiracy.

5.     Law enforcement's investigation of the drug-trafficking conspiracy included the use of court-authorized wiretaps, numerous controlled purchases of heroin and other narcotics from multiple co-conspirators, consensually recorded telephone calls and text messages, physical and video surveillance, information provided by multiple confidential sources of information deemed credible and reliable, and other investigative techniques.  The investigation has revealed the manner and means by which members of the conspiracy carried out the organization's unlawful drug-trafficking activities.  Among other things, members of the conspiracy did the following in furtherance of the conspiracy's unlawful objectives:

a.     obtained quantities of cocaine from HAYES, COPELAND, and HELMES;

b.     obtained quantities of crack cocaine from HELMES;

c.     used various residences and vehicles to store and distribute cocaine, crack cocaine, and other narcotics; cash proceeds of narcotics sales; and narcotics packaging paraphernalia in furtherance of their drug-trafficking activities;

d.     distributed packaged cocaine, crack cocaine, and other narcotics to others in and around Monmouth and Middlesex Counties, New Jersey; and

e.     took affirmative steps to avoid detection by law enforcement, including using prepaid cellular telephones with fictitious or no subscriber information, traveling in multiple rental vehicles, employing counter

surveillance techniques of law enforcement vehicles, and speaking in coded language to disguise the illicit nature of their discussions.

## II.   WIRETAPS

6.    From in or around April 2019 to in or around August 2019, law enforcement, acting pursuant to wiretap orders entered by the United States District Court for the District of New Jersey, intercepted wire and electronic communications over the following cellular telephone facilities, which HELMES and HAYES used in furtherance of the conspiracy:

   a.    From in or around April 2019 to in or around June 2019, law enforcement intercepted telephone calls and text messages over the HELMES 5706 Facility, which HELMES used to communicate with his co-conspirators and others in furtherance of the conspiracy.

   b.    From in or around June 2019 to in or around July 2019, law enforcement intercepted telephone calls and text messages over the HAYES 2450 Facility, which HAYES used to communicate with his co-conspirators and others in furtherance of the conspiracy.

   c.    From in or around July 2019 to in or around August 2019, law enforcement intercepted telephone calls and text messages over the HELMES 4342 Facility, which HELMES used to communicate with his co-conspirators and others in furtherance of the conspiracy.

7.    The telephone calls and text messages intercepted over these telephone facilities further revealed the scope and details of the conspiracy's unlawful drug-trafficking activities, including the identities of several of its narcotics suppliers and other co-conspirators.  Summarized below are some of the communications that law enforcement intercepted by, between, and among the co-conspirators and others in furtherance of the conspiracy.[2]

---

[2] Unless noted otherwise, all communications described in this complaint involving LOGAN occurred over the LOGAN 4598 Facility; all communications involving COPELAND (1) between on or about May 23, 2019 and on or about June 1, 2019 occurred over the COPELAND 9900 Facility; (2) between on or about June 1, 2019 and on or about July 1, 2019 occurred over the COPELAND 8151 Facility; (3) between on or about July 5, 2019 and on or about July 15, 2019 occurred over the COPELAND 3792 Facility; and (4) between on or about July 17, 2019 and on or about July 25, 2019 occurred over the COPELAND 9900 Facility; and all communications involving HELMES (1) between on or about April 29, 2019 and on or about June 12, 2019 occurred over the HELMES 5706 Facility; and (2) between on or about July 5, 2019 and on or about August 10, 2019 occurred over the HELMES 4342 Facility.

***HELMES AND HAYES***

8.     During the investigation, law enforcement intercepted numerous communications over the HELMES 5706 Facility between HELMES and HAYES that were in furtherance of the drug-trafficking conspiracy.  These communications revealed, among other things, that HAYES supplied significant quantities of cocaine to HELMES on a regular basis, and that HELMES re-distributed those supplies of cocaine, portions of which HELMES converted into crack cocaine, to others in and around Monmouth County and elsewhere. During and in furtherance of the conspiracy, HAYES supplied HELMES with more than 500 grams of cocaine.

9.     The communications intercepted over the HELMES Facilities also revealed that, in furtherance of the conspiracy, HELMES agreed to supply, and did supply, other co-conspirators, various dealers, sub-dealers, and end users with the supplies of cocaine that he obtained, portions of which HELMES converted into crack cocaine prior to redistribution.

10.     Summarized in the paragraphs below are communications intercepted over the HELMES 5706 Facility, demonstrating some of HELMES' and HAYES' acts in furtherance of the conspiracy.  Additional communications intercepted over the HELMES Facilities demonstrating other co-conspirators' roles in the conspiracy are summarized elsewhere in this complaint.

11.     On or about May 2, 2019, an individual later determined to be HAYES called HELMES.  During the conversation, HELMES asked if HAYES was "available."  HAYES responded that he needed to call someone "real quick." HELMES replied, "Alright, call me right back bro."  A few minutes later, HAYES called HELMES back and said that the unnamed individual "don't get off til 4:30."  HELMES responded, "Alright, say no more" and asked HAYES to call him when HAYES was "ready."

12.     A few hours later, at around 5:13 p.m., HELMES texted HAYES "Bout to grab something to eat from 80th street bro."  Based on the context of this message, the investigation, and the subsequent communications and interactions between HELMES and HAYES, I believe HELMES sent HAYES a text message in coded language constituting an order for 80 grams of cocaine.

13.     Later that same night, at around 8:36 p.m., HELMES called HAYES again and asked if HAYES was "available."  HAYES responded, "Yeah hit me, text me."  HELMES replied, "I'm gonna text you right now." Approximately two minutes later, HELMES texted HAYES, "I'm going to eat at the spot on 40th my guy."  Based on the context and the investigation, I believe that HELMES sent HAYES a text message in coded language constituting another order for 40 grams of cocaine.  HAYES replied via text message to

11

HELMES about a minute later stating, "Im coming wit u be there atvlike 10," meaning that HAYES would have the 40 grams of cocaine ready for HELMES at around 10:00 p.m.  Approximately an hour later, HAYES spoke with HELMES over the phone and advised HELMES to "come to the crib."  HELMES responded that he would be "right there."

14.     In similar fashion, HELMES placed orders of cocaine from HAYES on May 5, 2019 (50 grams), May 12, 2019 (50 grams), May 7, 2019 (100 grams), May 11, 2019 (100 grams), and May 25, 2019 (60 grams).

15.     On May 4, 2019, HELMES called HAYES, who advised HELMES, "I'm getting off now, about to be back in the hood now, I'm just getting off, text me."  HELMES responded, "I'll text you right now."  A few minutes later, HELMES texted HAYES, "It's a party at 120th st, you coming."  HAYES responded, "True."  Based on the context and the investigation, I believe that HELMES ordered 120 grams of cocaine from HAYES and HAYES agreed to the transaction.  Approximately half an hour later, HELMES called HAYES and advised that he would "be there in like one minute."

16.     A few hours later, HELMES called HAYES and complained that "the shit I just put down . . . is short fifteen."  HAYES asked HELMES how it could be short, and HELMES replied, "There's only one way it could be short … you know how to do math . . . That shit was thirty bro, all rock.  I'm talking about that shit I got, that shit ain't right."  Later in the conversation, HELMES asked HAYES, "what we doing about that though, my nigga, that is a very big loss."  A few minutes after this call, HELMES texted HAYES, "555 loss bro to much."  Based on the context of these communications and the investigation, I believe that HELMES contacted HAYES a few hours after he ordered, and likely obtained, what was supposed to have been 120 grams of cocaine from HAYES to complain that HAYES had not provided HELMES with the full quantity of cocaine that HELMES had ordered, and that the missing quantity of cocaine from HELMES' order resulted in a $555 loss in profits to HELMES.

17.     On May 21, 2019, at approximately 2:43 p.m., HAYES called HELMES.  During the conversation, HELMES advised, "I'm about to send you my text right now."  HELMES also said that he was going to "come see" HAYES later that day.  A short time later, HELMES texted HAYES, "RIP Buck."  Based on my training, experience, and conversations with other experienced narcotics investigators, I know that "buck" is a term commonly used by persons involved in the illicit drug trade to refer to the number 100.  Thus, I believe this text message included coded language and constituted an order for 100 grams of cocaine.  Approximately two minutes later, HAYES responded to HELMES via text message stating, "True" – meaning that HAYES acknowledged HELMES' order and agreed to provide HELMES with the requested 100 grams of cocaine.

18.    Later that day, at approximately 4:43 p.m., HELMES called HAYES and inquired as to HAYES' whereabouts. HAYES instructed HELMES to "come to the house bro." At approximately 4:49 p.m., law enforcement observed HELMES arrive on Milton Avenue in Neptune, New Jersey in a black Dodge Challenger (the "black Dodge Challenger"). HELMES exited the vehicle and approached a residence at on Milton Avenue (the "Milton Residence"), and knocked on the front door. After receiving no answer, HELMES sat down on the stairs leading to the front porch of the Milton Residence. At approximately 4:50 p.m., HELMES called HAYES and advised that he was "on the porch." HAYES instructed HELMES to "stay right there." About a minute later, law enforcement observed HAYES arrive at the Milton Residence in a gray Dodge Ram (the "Dodge Ram"). A few minutes later, HAYES and HELMES entered the Milton Residence together. A short time later, HELMES exited the Milton Residence, looked around, approached the black Dodge Challenger, and retrieved a red jacket and a black bag, which appeared to be empty. HELMES then walked back inside the Milton Residence.

19.    Then, at around 6:08 p.m., law enforcement observed HAYES exit the Milton Residence and enter the passenger side of a vehicle operated by another individual (hereafter "CC-1"). Approximately two minutes later, HAYES exited CC-1's vehicle and walked back inside the Milton Residence. Less than a minute later, HELMES exited the Milton Residence with the black bag around his neck, which now appeared weighed down, and departed the area.

20.    On May 22, 2019, at around 3:35 p.m., HELMES called Hayes and inquired as to HAYES' whereabouts. HAYES responded that he was "right here, by the crib" – meaning the Milton Residence. HELMES then asked how long he had to wait before HAYES was ready. HAYES responded that he was ready, and instructed HELMES to "text" him.

21.    At around 4:21 p.m., HELMES sent HAYES a text message stating: "I'm going to fuck with the diner on 70th bro." Based on prior intercepted communications between HAYES and HELMES, I believe this text message was in coded language and constituted an order for 70 grams of cocaine. Thereafter, HELMES and HAYES exchanged several telephone calls, mostly to arrange a meeting time.

22.    Later that evening, at around 7:52 p.m., law enforcement conducting surveillance in the area of the Milton Residence observed CC-1 sitting inside CC-1's vehicle, which was parked on the side of the Milton Residence. Approximately three minutes later, HAYES called HELMES and asked where HELMES was. HELMES responded that he was "right down the street." About a minute later, law enforcement observed HELMES arrive at the Milton Residence in the black Dodge Challenger. HELMES parked his vehicle in the parking lot located behind the Milton Residence, approached the Milton Residence and knocked on the front door, but no one answered. At

approximately 7:58 p.m., law enforcement observed HAYES arrive at the Milton Residence in the Dodge Ram. HAYES exited the Dodge Ram, greeted HELMES at the front door of the Milton Residence, and then entered the Milton Residence with HELMES.

23. A few minutes later, HAYES exited the Milton Residence and entered the passenger side of CC-1's vehicle, which was still parked outside of the Milton Residence. HAYES and CC-1 met inside the vehicle for several minutes before HAYES exited the vehicle and CC-1 departed the area. HAYES then walked back inside the Milton Residence. A few minutes later, CC-1 returned to the Milton Residence and parked in the same location in which CC-1 had been parked before. About two minutes later, HAYES exited the Milton Residence and entered the passenger side of CC-1's vehicle. A few minutes later, HAYES exited CC-1's vehicle and walked back inside the Milton Residence. Approximately eight minutes later, at around 8:24 p.m., HELMES exited the Milton Residence, entered the black Dodge Challenger, and departed the area.

### COPELAND

24. During the investigation, law enforcement intercepted numerous communications over the HELMES Facilities between HELMES and COPELAND that were in furtherance of the drug-trafficking conspiracy. These communications revealed, among other things, that COPELAND supplied significant quantities of cocaine to HELMES on a regular basis, and that HELMES re-distributed those supplies of cocaine, portions of which HELMES converted into crack cocaine, to others in and around Monmouth County and elsewhere. During and in furtherance of the conspiracy, COPELAND supplied HELMES with more than 500 grams of cocaine.

25. On May 24, 2019, HELMES and an individual later determined to be COPELAND exchanged the following text messages:

| Sender | Recipient | Message |
| --- | --- | --- |
| COPELAND | HELMES | I'm around bro I ain't go to work |
| HELMES | COPELAND | Wya? (meaning "Where you at?") |
| COPELAND | HELMES | U in the area |
| HELMES | COPELAND | Matawan but I could pull up asap I wanna grab something and see what it do |
| COPELAND | HELMES | A1 |
| HELMES | COPELAND | Wya |
| COPELAND | HELMES | I'm bout to go to Eatontown |
| HELMES | COPELAND | How long |
| COPELAND | HELMES | I'm bout to leave now |
| HELMES | COPELAND | I'll be there in like 20 mins |
| COPELAND | HELMES | Wht was the address? |

14

| Sender | Recipient | Message |
|--------|-----------|---------|
| COPELAND | HELMES | The house number |
| COPELAND | HELMES | I remember the street I forgot the house number |
| HELMES | COPELAND | I'm going to East 40th by the park |
| COPELAND | HELMES | Ok |

26.    Based on the context of these communications and others, I believe that HELMES made arrangements to meet with COPELAND in Eatontown, New Jersey for the purpose of purchasing a quantity of cocaine from COPELAND.  Specifically, HELMES sent COPELAND a text message in coded language ("I'm going to East 40th by the park") advising COPELAND of the specific quantity of cocaine, 40 grams, that HELMES wanted to obtain from COPELAND.

27.    COPELAND and HELMES exchanged additional telephone calls arranging a meeting time and location in Eatontown.  HELMES called COPELAND, who advised that he was "about to pull up right now."  HELMES responded, "I'm right here by the post office."  COPELAND asked, "right across the street?"  HELMES responded affirmatively.  Copeland then advised that he was "going to pull up right there where you at."  HELMES replied, "Alright, say no more."  A little over six hours later, HELMES called COPELAND, who stated "I'm just making sure everything was cool … everything was good?"  HELMES responded affirmatively, advising COPELAND that "everything was gravy."  Based on the context and the investigation, I believe that COPELAND was checking with HELMES to make sure that HELMES did not have any complaints from his customers regarding the quality of the cocaine that COPELAND supplied to HELMES earlier in the day.  HELMES informed COPELAND was "everything was gravy," meaning that there were no issues with the cocaine that COPELAND supplied to him.

28.    On June 5, 2019, at approximately 4:21 p.m., COPELAND called HELMES, who stated "I'm about to text you."  COPELAND responded that he was about to "shoot straight to" HELMES.  HELMES then reiterated, "I'm gonna text you right now."  Thereafter, HELMES and COPELAND exchanged the following text messages, among others:

| Sender | Recipient | Message |
|--------|-----------|---------|
| HELMES | COPELAND | You think it's going to rain??... |
| COPELAND | HELMES | Yeah On my way! |
| COPELAND | HELMES | To Eatontown |
| HELMES | COPELAND | Bet |

29.    Based on the context and the investigation, I believe that HELMES made arrangements to meet with COPELAND in Eatontown, New Jersey for the purpose of purchasing a quantity of cocaine from COPELAND.  Specifically, HELMES sent COPELAND a text message in coded language indicating the

quantity of cocaine HELMES wanted to obtain from COPELAND, as represented by the question marks in the text message "You think it's going to rain??...". Based on COPELAND's prior and subsequent communications and meetings with HELMES, as well as intercepted communications between HELMES and other co-conspirators following his meetings with COPELAND, I believe that one question mark in this code represented a quantity of 50 grams. Thus, in this coded text message, I believe that HELMES ordered 100 grams of cocaine.

30.    COPELAND and HELMES exchanged additional text messages about their timing to reach the meeting location. At around 5:12 p.m., HELMES texted COPELAND, "10 mins." COPELAND responded, "Ok." At approximately 5:25 p.m., HELMES texted COPELAND, "Pulling up." COPELAND responded, "2min."

31.    At approximately 5:25 p.m., law enforcement observed HELMES, in the black Dodge Challenger, arrive on South Street in Eatontown and park his vehicle in front of the Southbrook Apartments. Approximately two minutes later, law enforcement observed COPELAND arrive at the same location in a red Nissan Altima registered to COPELAND (the "red Nissan Altima") and park in front of the black Dodge Challenger. HELMES then exited the black Dodge Challenger and entered the red Nissan Altima. Approximately one minute later, HELMES exited the red Nissan Altima and got back into the black Dodge Challenger. Both HELMES and COPELAND then departed the area in their respective vehicles.

32.    In a similar fashion, HELMES ordered 50 grams of cocaine from COPELAND on June 7, 2019. At approximately 5:52 p.m., COPELAND called HELMES, who advised COPELAND, "I'm about to send you a text." Thereafter, between approximately 5:53 p.m. and 6:30 p.m., HELMES and COPELAND exchanged the following text messages, among others:

| Sender | Recipient | Message |
|---|---|---|
| COPELAND | HELMES | Rb |
| HELMES | COPELAND | ?? |
| COPELAND | HELMES | Ok rb how long? |
| HELMES | COPELAND | Less than an half bro |
| COPELAND | HELMES | Ok a |
| HELMES | COPELAND | Pardon me bro? |
| COPELAND | HELMES | Ok |
| HELMES | COPELAND | Same place |

33.    Based on the context and the investigation, I believe that HELMES made arrangements to meet with COPELAND in Red Bank, New Jersey for the purpose of purchasing a quantity of cocaine from COPELAND. Initially, HELMES texted "??," indicating that he wanted to obtain 100 grams of cocaine from COPELAND. However, approximately half an hour later, HELMES

16

changed his order to 50 grams of cocaine by texting COPELAND "Pardon me bro?..."

34.    Thereafter, HELMES and COPELAND exchanged additional text messages about their timing to reach the meeting location. At approximately 7:12 p.m., law enforcement observed HELMES meeting with COPELAND in the parking lot of the Montgomery Towers housing complex located on Tilton Avenue in Red Bank, New Jersey.

35.    On June 10, 2019, at approximately 9:37 a.m., COPELAND called HELMES, who asked if he could "get to" COPELAND. COPELAND responded affirmatively, and then HELMES advised, "Alright, I'm about to text you." Thereafter, between approximately 9:38 a.m. and 9:45 a.m., HELMES and COPELAND exchanged the following text messages:

| Sender | Recipient | Message |
|---|---|---|
| HELMES | COPELAND | You woke ?? |
| COPELAND | HELMES | I just woke up on my way to rb |
| HELMES | COPELAND | Give me an hour |
| COPELAND | HELMES | Hit me when u on ya way |

36.    Based on the context and the investigation, I believe that HELMES made arrangements to meet with COPELAND in Red Bank for the purpose of purchasing 100 grams of cocaine from COPELAND.

37.    COPELAND and HELMES exchanged additional text messages concerning the timing of their arrival at the meeting location. At approximately 11:17 a.m., COPELAND texted HELMES, "Here." HELMES responded via text message about a minute later, stating "Bet 1 min."

38.    In fact, at approximately 11:15 a.m., law enforcement observed COPELAND arrive in the red Nissan Altima and park on Clifford Place in Red Bank, which is located approximately one block south of the Montgomery Terrace housing complex where COPELAND met HELMES on June 7, 2019. At approximately 11:27 a.m., law enforcement observed HELMES arrive on Clifford place in the black Dodge Challenger. HELMES parked his vehicle, exited and got into the red Nissan Altima. Approximately two minutes later, HELMES exited the red Nissan Altima, got back into the black Dodge Challenger and departed the area.

39.    On June 11, 2019, between approximately 4:18 p.m. and approximately 5:11 p.m., HELMES and COPELAND exchanged the following text messages:

| Sender | Recipient | Message |
|---|---|---|
| HELMES | COPELAND | ?? |

| Sender | Recipient | Message |
|---|---|---|
| COPELAND | HELMES | Tru |
| COPELAND | HELMES | Hit me when u ready |
| HELMES | COPELAND | Same place? |

40.    Then, at approximately 5:12 p.m., HELMES called COPELAND and said, "I just sent you a text right, I ain't mean to put that [unintelligible] in there." COPELAND responded, "Alright." Approximately a minute later, COPELAND texted HELMES, "??" HELMES responded via text message a few minutes later, stating "Facts."

41.    Based on the context of these communications and the investigation, I believe that HELMES made arrangements to meet with COPELAND for the purpose of purchasing a quantity of cocaine from COPELAND. Specifically, at around 4:18 p.m., HELMES sent COPELAND a text message in coded language ("??") indicating the amount of cocaine, 100 grams, HELMES wanted to obtain from COPELAND. A short time later, HELMES text-messaged COPELAND asking "Same place?" and immediately thereafter called COPELAND to explain that he did not "mean to put that [unintelligible] in" the text message. Based on the context of HELMES' statement in this call, and the text messages that immediately preceded and followed this call, I believe that HELMES was referring to the question mark punctuating the message "Same place" when he told COPELAND that he did not "mean to put that [unintelligible] in there." Indeed, COPELAND text-messaged HELMES "??" immediately after that call to confirm HELMES' order, which HELMES confirmed by responding "Facts" in the next text message.

42.    HELMES and COPELAND exchanged additional text messages about their timing to reach the meeting location. For instance, at approximately 6:37 p.m., HELMES texted COPELAND, "Here." COPELAND responded a few minutes later, asking "Wya" (meaning "Where you at?"). HELMES replied via text message approximately a minute later stating "Walking to you." In fact, at approximately 6:40 p.m., law enforcement observed HELMES meeting with COPELAND on West Westside Avenue in Red Bank, New Jersey. HELMES arrived in the black Dodge Challenger, and COPELAND arrived in the red Nissan Altima. HELMES exited his vehicle and got into the red Nissan Altima. Approximately three minutes later, HELMES exited the red Nissan Altima and returned to the black Dodge Challenger. Thereafter, both HELMES and COPELAND departed the area in their respective vehicles

43.    In a similar fashion, HELMES placed orders of 100 grams of cocaine from COPELAND using the "??" code in text messages exchanged with COPELAND on July 15, 2019 and July 22, 2019. Meetings between HELMES and COPELAND on these dates were confirmed by law enforcement through

physical surveillance conducted in the area of Clifford Place in Red Bank on July 15, 2019, and in the area of Milton Avenue in Neptune on July 22, 2019.

44.    On July 11, 2019, HELMES sent a text message to COPELAND – "????" – indicating that he wanted to purchase 200 grams of cocaine from COPELAND.  COPELAND agreed to the same and texted HELMES to give him "like an hour."  At around 2:30 p.m., HELMES called COPELAND, who advised "I just got my hands on it."  HELMES and COPELAND then made arrangements to meet in approximately thirty minutes.  Thereafter, at around 2:58 p.m., HELMES texted COPELAND, "Here."  Approximately two minutes later, law enforcement observed COPELAND depart his girlfriend's residence in Brick, New Jersey, in the red Nissan Altima.  A minute later, COPELAND texted HELMES, "On my way!"  At approximately 3:26 p.m., law enforcement observed COPELAND meet with HELMES on Clifford Avenue.  COPELAND exited the red Nissan Altima, entered the back seat of HELMES' vehicle (a rented black Nissan Altima bearing New York license plates), and conducted a hand-to-hand transaction with HELMES.  COPELAND then exited HELMES' vehicle, got back into the red Nissan Altima, and departed the area.

45.    On July 21, 2019, at around 7:35 p.m., COPELAND sent HELMES a text message stating, "Tht 1450 short."  Approximately a minute later, COPELAND called HELMES and asked "You seen that?"  HELMES responded affirmatively, and then asked "What I give you, five right?"  COPELAND responded, "Hell no, that was three nine."  HELMES replied, "My bad bro, word is bond, give me like an hour.  I've got to the crib.  I grabbed the wrong one."  COPELAND responded, "Alright, yeah" and "it was five two five."  HELMES replied, "Alright" and "say no more, I got it, give me like an hour."  COPELAND responded, "Alright."

46.    Nearly an hour later, at approximately 8:34 p.m., HELMES called COPELAND and asked, "Remember the other day when I hit you, right?"  COPELAND responded affirmatively.  HELMES continued, "And then I was like come see me?"  COPELAND responded affirmatively.  HELMES continued, "And you came and seen me right, I had that to the side.  That's what I should have gave you that day.  That would have made that right.  So I grabbed the wrong one … my bad.  But look, my shit like, I need to run around for like an hour.  You could wait a second?"  COPELAND responded that he would just "get with" HELMES "in the morning."  HELMES acknowledged and advised that he would "come see" COPELAND in the morning.

47.    Based on the context of these communications and the investigation, I believe that HELMES and COPELAND met sometime prior to these communications and conducted a narcotics transaction.  Thereafter, COPELAND text-messaged HELMES "Tht 1450 short," meaning that HELMES' payment for the cocaine he purchased from COPELAND was short by $1,450. In the subsequent telephone call, COPELAND explained that HELMES should

have given him "five two five," meaning $5,250, but that HELMES only gave COPELAND "three nine," meaning $3,900.[3] In the last call, HELMES explained the mix up to COPELAND and asked if COPELAND could wait for an hour so HELMES could "run around," meaning so HELMES could sell some cocaine/crack cocaine to his customers to earn the amount of money he needed to pay COPELAND. COPELAND responded that he would just "get with" HELMES in the morning to collect the rest of the money.

***STEPHENS***

48.    The investigation has revealed that STEPHENS conspired with HELMES to engage in narcotics trafficking. For instance, on May 29, 2019, after setting up a meeting with COPELAND, HELMES called STEPHENS and asked if she could "bring it" – referring to money – to HELMES "real quick." HELMES advised STEPHENS, "I really need you to like hurry up because I got somebody coming." STEPHENS asked, "You don't got nothing?" HELMES responded, "I will as fast as you get here ... I got somebody coming now," referring to COPELAND. STEPHENS replied, "Alright, I'll be there." Approximately twelve minutes later, law enforcement observed STEPHENS arrive at the Glassworks apartment complex in Cliffwood, New Jersey in a white Dodge Avenger registered to STEPHENS (the "white Dodge Avenger"). Approximately nine minutes later, STEPHENS called HELMES and advised him that she was "outside." A short time later, HELMES exited Building 200 and entered the white Dodge Avenger. Approximately two minutes later, HELMES exited the white Dodge Avenger and walked back inside Building 200 as STEPHENS departed the area.

49.    Thereafter, at around 6:11 p.m., law enforcement observed HELMES meet with COPELAND outside of Building 200 at the Glassworks apartment complex. HELMES exited Building 200 and got into COPELAND's vehicle, a silver Lexus ES3, registered to and occupied by COPELAND. A short time later, HELMES exited COPELAND's vehicle as COPELAND departed the area.

50.    A few minutes later, HELMES called UNDERWOOD on the UNDERWOOD 5895 Facility. During this call UNDERWOOD asked if HELMES

---

[3] Based on the context of the communications between HELMES and COPELAND in paragraph 45 above, it appears that COPELAND's mathematical calculations were incorrect regarding either the amount of money HELMES had actually given COPELAND (i.e., $3,900) or the amount of money HELMES still owed to COPELAND (i.e., $1,450). That is, if HELMES was supposed to have paid COPELAND $5,250 for the cocaine, but had only given COPELAND $3,900, then HELMES' payment was only short by $1,350 rather than the "1450" that COPELAND indicated in his text message to HELMES in paragraph 45 above.

was "coming now" and advised that she would leave her door unlocked because she was about to leave her residence.  HELMES advised that he was coming "right now" and asked if she had "bags and everything."  UNDERWOOD responded, "Yeah, there's sandwich bags there, the baking soda ... Yeah, everything should be there ... Just lock the bottom lock when you leave." Based on the context of this call and the investigation, I believe that UNDERWOOD permitted HELMES to use her residence to "cook" or convert powder cocaine into crack cocaine.  Based on my training, experience and conversations with other experienced narcotics investigators, the process used by narcotics manufacturers and traffickers to convert, or "cook," powder cocaine into crack cocaine involves dissolving the powder cocaine in hot water, adding sodium bicarbonate (baking soda) to the mixture, boiling the solution to separate out the solids, and then cooling the separated mixture and cutting up the solids into "rocks" of crack cocaine.

51.    Approximately five minutes later, law enforcement observed HELMES leave the Glassworks apartment complex in the black Dodge Challenger and travel to the Treehaven III apartment complex, located in Matawan, New Jersey.  Based on physical surveillance of a prior meeting between HELMES and UNDERWOOD on May 15, 2019, as well as motor vehicle records reviewed by law enforcement, I believe that UNDERWOOD resides at that apartment complex.

52.    Then, at approximately 7:58 p.m., HELMES called STEPHENS and advised "I'm at your side door."  STEPHENS responded, "Alright."  Based on the context of these communications, the investigation, and prior and subsequent communications and interactions between HELMES and STEPHENS, I believe that HELMES delivered a quantity of crack cocaine to STEPHENS to her residence in Keansburg, New Jersey.

53.    The investigation has also revealed that STEPHENS regularly purchased large quantities of crack cocaine from HELMES, which she often received on consignment from HELMES and paid for after she had distributed the narcotics to her own customers.  For instance, on May 2, 2019, between approximately 4:23 p.m. and 5:13 p.m., HELMES and STEPHENS exchanged the following text messages:

| Sender | Recipient | Message |
| --- | --- | --- |
| STEPHENS | HELMES | I need to c u |
| HELMES | STEPHENS | How many |
| STEPHENS | HELMES | I need 10 pills too |

54.    Based on the context and the investigation, I believe that STEPHENS made arrangements to meet with HELMES for the purpose of purchasing 10 prescription pills and an unknown quantity of crack cocaine.

55.    Thereafter, at around 6:57 p.m., STEPHENS called HELMES and asked if HELMES had "roof." HELMES responded affirmatively. Based on my training, experience, and discussions with other experienced narcotics investigators, I know that the word "roof" is a term commonly used by persons involved in the illicit drug trade to refer to flunitrazepam, a schedule IV controlled substance which is also known more commonly by the brand name Rohypnol.

56.    At approximately 7:07 p.m., STEPHENS called HELMES who instructed her to meet him at the "Wendy's" on Cliffwood Avenue in Keyport, New Jersey. STEPHENS responded, "I'll be right there." Then, at approximately 7:11 p.m., law enforcement observed STEPHENS arrive in the parking lot of the Wendy's restaurant on Cliffwood Avenue in Keyport, in the white Dodge Avenger. At approximately the same time, law enforcement also observed HELMES arrive at the Wendy's in the black Dodge Challenger and park next to the white Dodge Avenger. HELMES exited the black Dodge Challenger and entered the front passenger side of the white Dodge Avenger. A short time later, HELMES exited the white Dodge Avenger, got back into the black Dodge Challenger and departed the area.

57.    On May 15, 2019, HELMES called STEPHENS and advised her that he would be traveling to Florida the next day, and that he would be gone for the next four days. HELMES told STEPHENS that he had "like 50 left" and that he was going to leave the "whole 50" with STEPHENS. HELMES instructed STEPHENS to "just give me the money when I come back" because he was going to need that "to make another move." HELMES told STEPHENS that "The shit is fire" and that he did not want to "give it to nobody else." HELMES advised STEPHENS that "when I bust my move ... I'll give you, I give it to you." HELMES then asked STEPHENS, "Do you want it?" STEPHENS responded affirmatively. HELMES advised STEPHENS, "Even if you not done, whatever, I'll come back and get the rest and move it." HELMES continued, "But, listen what I'm telling you, if my guy answer I'll have more. Just be patient." STEPHENS responded, "Alright." HELMES then told STEPHENS that he would bring "it" to her.

58.    Based on the context of this communication and the investigation, I believe that HELMES contacted STEPHENS to inform her that he would be traveling to Florida the next day and would be out of the area for the next four days. HELMES stated that he was going to give her 50 grams of crack cocaine that he still had so that she could sell it for him while he is out of town. HELMES explained that when he returned in four days, he would come and pick up the money STEPHENS made from selling the crack cocaine as well as any crack cocaine she had not sold. HELMES informed STEPHENS that he planned to use the profits from the sale of this 50 grams of crack cocaine to purchase another quantity of cocaine for redistribution, and that when he did so he would provide STEPHENS with some of that cocaine free of charge as

compensation for her.  STEPHENS agreed to take the 50 grams of crack cocaine and sell it for HELMES while he was out of town.  HELMES also advised STEPHENS that he may be bringing her more than 50 grams if he is able to obtain an additional quantity from his supplier before he leaves for Florida.

59.    Later that night, at around 9:55 p.m., STEPHENS texted HELMES asking, "When r u coming."  HELMES called STEPHENS approximately thirty minutes later and advised that he would "be there" in about "another hour."

60.    Less than a minute later, HELMES spoke with HAYES over the telephone, who advised that an unnamed individual had "slid out" on him and would not be back until "like fucking Friday or something."  HELMES responded, "Oh my God," and asked HAYES to "keep me posted."  HAYES agreed, and expressed frustration over the situation.

61.    Less than a minute later, HELMES called STEPHENS and said, "the reason I said an hour cuz the nigga told me he had something for me but he acting, like he acting funny and its already 10:30."  HELMES then advised STEPHENS, "I got like fourteen, you can come get it, you can have it, and if he come through with the rest and I just get what I said I was gonna get from him … and give that to you tomorrow before I leave."  STEPHENS responded that she did not have a car right now.  HELMES replied, "Alright.  Give me a second. I'll get to you."

62.    Based on the context of these communications and the investigation, I believe that HELMES contacted HAYES to obtain an additional quantity of cocaine before leaving for Florida.  HAYES, however, was unable to provide HELMES with the requested quantity of cocaine because HAYES' cocaine supplier had left the area and HAYES did not expect this person to be back until Friday, May 17, 2019, after HELMES has already left for Florida.  HELMES then contacted STEPHENS and explained the situation, telling her that he was not able to obtain an additional quantity of cocaine before he left for Florida the next day, that he had already sold all but 14 of the 50 grams of crack cocaine he spoke to her about earlier in the day, and that he would bring her the 14 grams of crack cocaine before he departed for Florida.

63.    On June 3, 2019, at approximately 10:07 a.m., HELMES called STEPHENS, who asked HELMES, "You got that picture I sent you?"  HELMES asked "What picture?"  STEPHENS responded, "Of the scale."  HELMES replied "Nah, I ain't get no picture."  STEPHENS then said, "Cause that shit wasn't what you said it was."  HELMES asked, "What was it?"  STEPHENS responded, "forty-four point one."  HELMES replied, "Oh, alright."  Based on the context and the investigation, I believe that sometime prior to this call HELMES supplied STEPHENS with 44.1 grams of crack cocaine, which was not the entire quantity that STEPHENS had ordered from him.

64.    On June 4, 2019, at approximately 11:13 a.m., HELMES called STEPHENS, who advised him of some telephone communications she had the previous day with one of her customers ("CC-2"). STEPHENS explained, "Yesterday, right, look, [CC-2] calls, he hit me, right, he say he need fourteen. So you know I ain't giving him that ever since you told me that shit, right? He gonna hit me back like, 'uh, how many did you give me? I told you fourteen, you only gave me twelve.' I'm like 'you buggin cause I definitely didn't even give you twelve.' [STEPHENS chuckling] Like he had a scale, he ain't have no fucking scales . . . So I said 'and by the way, you shorted me, you owe me twenty dollars.'" Later in the same call, HELMES advised STEPHENS, "I wanna try to make a move," meaning that he wanted to obtain another supply of cocaine from his supplier. STEPHENS responded that she had "like a thousand," meaning $1,000, "right now." HELMES replied, "That's beautiful" and instructed STEPHENS to "come get some more," meaning for STEPHENS to bring him the money and he would provide her with more narcotics. STEPHENS agreed and advised that she would "hit," meaning call or text, HELMES when she was on her way to meet him.

65.    Thereafter, at approximately 12:00 p.m., STEPHENS sent a text message to HELMES stating: "Omw [meaning 'On my way'] like 7 minutes away." Then, at around 12:10 p.m., STEPHENS sent another text message to HELMES stating: "Here." At approximately the same time, law enforcement observed STEPHENS arrive at the Glassworks apartment complex in the white Dodge Avenger and park outside Building 200. Approximately six minutes later, STEPHENS sent HELMES a text message stating: "Hurry up." Shortly thereafter, law enforcement observed HELMES exit Building 200, enter the white Dodge Avenger, and conduct a hand-to-hand transaction with STEPHENS. Approximately one minute later, HELMES exited the white Dodge Avenger and walked back inside Building 200 as STEPHENS departed the area.

66.    On June 5, 2019, at approximately 1:17 p.m., HELMES spoke to STEPHENS over the telephone and asked STEPHENS "Where you at?" STEPHENS responded that she was "in the shower." HELMES then advised, "I need a favor." STEPHENS asked "What?" HELMES responded, "I need nine," meaning 9 grams of cocaine or crack cocaine. STEPHENS replied, "Okay." HELMES responded, "Alright, I'm about to come." At approximately 2:00 p.m., law enforcement observed HELMES arrive at STEPHENS' residence in Keansburg in the black Dodge Challenger. STEPHENS exited her residence and met with HELMES outside. HELMES then met with another co-conspirator ("CC-3") outside STEPHENS' residence, and conducted a hand-to-hand transaction with CC-3. CC-3 then walked to the corner of Bay Avenue and Highland Avenue and conducted a hand-to-hand transaction with two unidentified individuals. Thereafter, CC-3 returned to STEPHENS' residence and met with HELMES, STEPHENS, and another individual. HELMES, STEPHENS, CC-3 and the other individual then entered STEPHENS' residence

together. Approximately five minutes later, HELMES exited STEPHENS' residence and departed the area in the black Dodge Challenger.

67. On June 12, 2019, between approximately 7:59 a.m. and 8:28 a.m., HELMES and STEPHENS communicated to arrange for STEPHENS to purchase narcotics from HELMES, by exchanging the following text messages:

| Sender | Recipient | Message |
|----------|-----------|----------------------------------|
| STEPHENS | HELMES | I need to c u |
| STEPHENS | HELMES | Got all ya bread |
| HELMES | STEPHENS | How much is that? |
| STEPHENS | HELMES | 1225 |
| HELMES | STEPHENS | Ok come on |
| STEPHENS | HELMES | Already driving |
| HELMES | STEPHENS | Ok |
| STEPHENS | HELMES | Here |
| STEPHENS | HELMES | Can u please hurry up I have court |
| HELMES | STEPHENS | Ok |

68. Based on the context and the investigation, I believe that STEPHENS contacted HELMES to make arrangements to obtain an additional supply of crack cocaine from HELMES and to pay HELMES the $1,225 she owed him for the previous quantity of crack cocaine he supplied to her. Approximately an hour and a half after the last text message above, at around 9:06 a.m., STEPHENS sent HELMES a text message stating "It was only 27.5," likely meaning that HELMES had only given STEPHENS 27.5 grams of crack cocaine and that STEPHENS had expected to receive more than that amount.

69. On July 21, 2019, at approximately 8:33 p.m., STEPHENS called HELMES and advised "I got some bread for you." HELMES asked, "How much?" STEPHENS responded, "I think I got a thousand," meaning $1,000. HELMES advised STEPHENS that he was about to leave Long Branch and instructed her to come meet him in Matawan because he had to "go into the kitchen anyway," likely meaning that he needed to convert the powder cocaine he received from COPELAND earlier that day into crack cocaine. HELMES advised STEPHENS that he would be ready to meet with her in "a little over an hour." A few hours later, at approximately 10:28 p.m., STEPHENS called HELMES and asked if he had "it together already," meaning crack cocaine. HELMES responded affirmatively. STEPHENS then stated, "I'm about to come cuz I'm going to need it tonight." A short time later, at around 10:51 p.m., STEPHENS texted HELMES, "Here." HELMES responded a few minutes later via text message stating "ok."

70. Early the next morning, on July 22, 2019, at around 12:33 a.m., STEPHENS sent HELMES a text message stating, "This different then what u usually have n not all the way dry so u know it's not what u say it is when it

dry." Based on the context and the investigation, I believe that STEPHENS advised HELMES that the crack cocaine she obtained from him a few hours earlier was not "all the way dry" and that the weight of the crack cocaine would be less than the amount that HELMES intended to give STEPHENS once it dried out properly.

71.    Later that same morning, at around 10:24 a.m., HELMES called STEPHENS and asked, "Did it dry out now?" STEPHENS' response was unintelligible. HELMES then stated, "Listen, when you told me that, when I seen that this morning, I went in and I took the rest of what I did, it was sixty-seven right, I gave you fifty-six, I kept sixty-seven. I put the sixty-seven back into the bowl. I squeezed it [unintelligible] I just smashed my hand on it to see if it was soft, and then it crumbled when I smashed it. So, I put it in a jar and I re-did it. I lost three. But it came out right." STEPHENS responded, "It's harder than it was cause I left the bag open to let it dry out like that." HELMES responded, "Alright." STEPHENS then stated, "Look, that shit gonna go, they take whatever I have, they don't like going to nobody else." HELMES responded, "That's because it be good." HELMES then advised STEPHENS, "If somebody complain to you, let me know and I'll re-do it." STEPHENS responded, "Alright."

72.    Based on the context of this call and the investigation, I believe that HELMES sold STEPHENS 56 grams of crack cocaine out of the 123 grams of crack cocaine he cooked the day before. After seeing the text from STEPHENS, HELMES advised that he tested his 67 grams of crack cocaine by "squeezing" it and "smashing" it with his hand. Based on the results of that experiment, HELMES decided to "re-do," or re-cook, his 67 grams. After doing that, HELMES advised that he lost 3 grams in the process, but noted that the final product "came out right." STEPHENS advised HELMES that the 56 grams of crack cocaine he had given to her had gotten "harder" overnight as she "left the bag open to let it dry out." STEPHENS further explained that she would have no problems selling the 57 grams of crack cocaine in her possession because her customers "take whatever" she has and do not like buying their crack cocaine from anyone else. HELMES then offered to "re-do" STEPHENS' 56 grams of crack cocaine if she received any complaints from her customers about the quality of the crack cocaine.

**WALKER**

73.    The investigation has revealed that WALKER frequently obtained narcotics from HELMES for further distribution.

74.    For instance, on May 3, 2019, HELMES and WALKER communicated to arrange a meeting in the area of Milton Avenue in Neptune, New Jersey, for WALKER to obtain narcotics from HELMES. Between

26

approximately 12:10 p.m. and approximately 12:23 p.m., HELMES and WALKER exchanged the following text messages:

| Sender | Recipient | Message |
|--------|-----------|---------|
| WALKER | HELMES | I need 20 da other |
| HELMES | WALKER | Wya? |
| WALKER | HELMES | Hood |
| HELMES | WALKER | Cuz |
| WALKER | HELMES | Im on my way |

75.    Based on the context and the investigation, I believe that WALKER contacted HELMES seeking to obtain 20 grams of cocaine. HELMES advised that he was at his cousin's residence, and WALKER responded that she was on her way to meet with HELMES there. Then, at approximately 12:45 p.m., law enforcement observed WALKER arrive outside a residence on Milton Avenue in Neptune, New Jersey in a silver Hyundai Tucson (the "Hyundai Tucson"). HELMES walked over to the Hyundai Tucson and conducted a hand-to-hand transaction with WALKER. WALKER then departed the area.

76.    Later that same day, between approximately 5:48 p.m. and 5:52 p.m., HELMES and WALKER exchanged the following text messages, among others:

| Sender | Recipient | Message |
|--------|-----------|---------|
| HELMES | WALKER | Wya |
| WALKER | HELMES | Hood |
| HELMES | WALKER | Ok be there in about 20 |
| HELMES | WALKER | U finished? |
| WALKER | HELMES | Almost |
| HELMES | WALKER | How much u got |
| WALKER | HELMES | 8 |
| HELMES | WALKER | How much you supposed to have |
| WALKER | HELMES | 12 |
| HELMES | WALKER | Ok |

77.    Based on the context and the investigation, I believe that WALKER and HELMES made arrangements to meet a second time on May 3, 2019 so that WALKER could obtain an additional amount of narcotics from HELMES for redistribution. WALKER advised HELMES that she was almost finished with the 20 grams she obtained from HELMES earlier in the day, that she had $800 to give to HELMES, likely representing cash proceeds from sales to her own customers, and that she was owed an additional $400 from one or more of her drug customers.

78.    At approximately 6:24 p.m., law enforcement observed HELMES and WALKER meet outside on Milton Avenue. WALKER arrived in the Hyundai

Tucson at around the same time as HELMES arrived in the black Dodge Challenger. HELMES and WALKER then engaged in a hand-to-hand transaction before WALKER departed the area in her vehicle. Law enforcement followed WALKER as she traveled to the Asbury Park Railroad Plaza where, at approximately 6:43 p.m., she met an unidentified co-conspirator ("CC-4") and engaged in a suspected hand-to-hand narcotics transaction with CC-4.

79.    On May 4, 2019, between approximately 7:35 p.m. and 8:28 p.m., WALKER and HELMES exchanged the following text messages, among others:

| Sender | Recipient | Message |
|--------|-----------|---------|
| WALKER | HELMES | I got bread |
| HELMES | WALKER | Ok how much |
| WALKER | HELMES | 850 |
| HELMES | WALKER | Wys |
| WALKER | HELMES | On 66 headed to pwat |
| WALKER | HELMES | Pway |
| HELMES | WALKER | Ok I'm going to hood |
| WALKER | HELMES | Running to matawan b right back |

80.    Based on the context and the investigation, I believe that WALKER advised HELMES that she had $850 to give to HELMES, likely representing cash proceeds from earlier narcotics transactions with her drug customers. At approximately 9:34 p.m., WALKER called HELMES and advised that she was "in the hood." HELMES responded, "Alright, give me like ten minutes, I'm about to finish smoking this blunt, and then I'll come outside."

81.    Later that night, at between approximately 11:01 p.m. and 11:22 p.m., HELMES and WALKER exchanged the following text messages:

| Sender | Recipient | Message |
|--------|-----------|---------|
| WALKER | HELMES | I got a few more coins for u |
| WALKER | HELMES | I need 30feet right now |
| HELMES | WALKER | Matawan |
| WALKER | HELMES | Kk |

82.    Based on the context of these communications and the investigation, I believe that WALKER advised HELMES that she had an additional amount of money to give to HELMES and then, in coded language, advised that she needed to obtain 30 grams of narcotics from HELMES right away. HELMES advised WALKER to come to meet him in Matawan for the transaction.

83.    Approximately twenty-five minutes later, WALKER called HELMES and advised "I'm here." A few minutes later, HELMES called WALKER and asked "hard or soft," meaning crack cocaine or powder cocaine. WALKER

responded "hard," meaning she needed crack cocaine. HELMES responded that he would be "right down" to meet her.

84.    On May 7, 2019, HELMES and WALKER communicated throughout the day to coordinate narcotics transactions with various customers. For instance, between approximately 3:41 p.m. and 3:47 p.m., WALKER and HELMES exchanged the following text messages:

| Sender | Recipient | Message |
| --- | --- | --- |
| WALKER | HELMES | Im home wit my kids somebody in the hoodc wants something but |
| HELMES | WALKER | But what? |
| WALKER | HELMES | I don't got wat they want and u havent called me so |
| WALKER | HELMES | Not enough |
| HELMES | WALKER | Come to hood |
| WALKER | HELMES | Ok on my way |

85.    Based on the context of these communications and the investigation, I believe that WALKER informed HELMES that one of her customers had reached out to her to purchase narcotics but that she did not have the amount of narcotics the customer wanted to purchase. HELMES instructed WALKER to meet him in the "hood" to obtain the amount of narcotics she needed to make the sale. WALKER agreed and said she was on her way.

86.    At approximately 4:55 p.m., law enforcement observed WALKER arrive outside a residence on Milton Avenue in Neptune. WALKER exited her vehicle and walked inside the Milton Avenue residence. Approximately twenty minutes later, law enforcement observed WALKER and HELMES exit residence together. HELMES walked over to the black Dodge Challenger as WALKER entered her vehicle. HELMES then walked over to WALKER's vehicle before WALKER departed the area.

87.    A few hours later, HELMES called WALKER ad asked if she "went and did that, or no?" WALKER responded affirmatively. HELMES then asked, "How much was it?" WALKER responded that she had "like four hundred," meaning $400, for HELMES "right now." HELMES advised that he needed the $400 right away and instructed WALKER to meet him in the "hood."

88.    On May 10, 2019, HELMES and WALKER communicated throughout the day to coordinate narcotics transactions. For instance, between approximately 11:26 a.m. and 12:38 p.m., HELMES and WALKER exchanged the following text messages:

| Sender | Recipient | Message |
|--------|-----------|---------|
| WALKER | HELMES | Do u have anything or naw |
| HELMES | WALKER | Yes |
| WALKER | HELMES | Do u got something for me or u done |
| WALKER | HELMES | I got ppl calling for mad shit if not just tell me where you want to meet |

89.   Then, at approximately 12:54 p.m., HELMES called WALKER and inquired as to WALKER's whereabouts.  WALKER responded that she was at her residence and that "either way I have to come and see you."  WALKER explained, "I got mad people calling me for mad shit."  Based on the context of these communications and the investigation, I believe that WALKER advised HELMES that she had numerous customers contacting her to purchase narcotics and that she needed to "see" HELMES to obtain the narcotics she needed to conduct the transactions with her customers.

90.   At approximately 4:23 p.m., WALKER texted HELMES, "Pulling up."  Approximately two minutes later, law enforcement observed WALKER arrive at the Riverview Hospital in Red Bank, New Jersey.  At around 5:12 p.m., WALKER texted HELMES asking, "R u coming."  HELMES called WALKER a few minutes later and advised that he was "in the elevator" and "coming down right now."  Thereafter, at approximately 5:22 p.m., law enforcement observed WALKER drop HELMES off at the Glassworks apartment complex.

91.   A little more than two hours later, at approximately 7:43 p.m., WALKER called HELMES and said, "I'm done," meaning that she had sold all the narcotics HELMES had provided to her earlier in the day.  HELMES instructed WALKER to meet him in "the hood."  Then, at around 8:19 p.m., HELMES called WALKER and changed the meet location to the Monmouth Mall in Eatontown, New Jersey.  At approximately 8:36 p.m., WALKER called HELMES, who advised WALKER that he was "coming out in one second."  Less than a minute later, law enforcement observed HELMES meeting with WALKER in the parking lot of the Monmouth Mall.  WALKER walked over to the black Dodge Challenger with HELMES, who opened the driver's side door and sat down.  WALKER squatted down next to the open driver's side door and leaned in as HELMES handed her something.

***LOGAN***

92.   The investigation has revealed that LOGAN conspired with HELMES to engage in narcotics trafficking.

93.   For instance, on May 21, 2019, between approximately 12:51 a.m. and 1:03 a.m., upon his return from his trip to Florida, HELMES exchanged the following text messages, among others, with LOGAN in which LOGAN

agreed to provide HELMES with money so that HELMES could obtain a supply
of cocaine from HAYES:

| Sender | Recipient | Message |
|--------|-----------|---------|
| HELMES | LOGAN | I'm back |
| LOGAN | HELMES | Damn WTF .. I was scared n didn't no ur name to try to bail or anything wtf brother |
| HELMES | LOGAN | Nah I'm gees I was in Florida but I'll build with you face to face, I got a question tho |
| LOGAN | HELMES | Anything |
| LOGAN | HELMES | I been dead since Yu n I needed that thou .. to slow me down .. |
| HELMES | LOGAN | You got any bread I could put in this move |
| LOGAN | HELMES | Yeah |
| LOGAN | HELMES | I go to court on the 18th |
| HELMES | LOGAN | How much |
| LOGAN | HELMES | Hw much Yu need bro |
| HELMES | LOGAN | As much as possible |
| LOGAN | HELMES | I got a rack right now unless I resigned on this lawyer |
| HELMES | LOGAN | That's good, I am bussing a move first thing in the AM |

94.    Based on the context of these communications and others, I
believe that HELMES asked LOGAN for money so that HELMES could obtain a
quantity of cocaine from his supplier, HAYES.  LOGAN agreed to provide
HELMES with money.

95.    Later that day, at around 2:28 p.m., HELMES called LOGAN and
thanked LOGAN for loaning him $1,500 and promised to pay LOGAN back the
money LOGAN had loaned him.  HELMES also advised LOGAN that he was
"about to holla at my guy now" – meaning that HELMES was going to contact
his supplier, HAYES – and that he would contact LOGAN when he came "back
up."  Approximately five minutes later, LOGAN called HELMES back and
advised "you don't have to give me all cash, you can give me work too" –
meaning that HELMES could provide narcotics to LOGAN to sell on HELMES'
behalf.  HELMES responded, "I got you, you already know."  LOGAN replied,
"Yeah, we can do it like that, know what I mean."

96.    Thereafter, as detailed in paragraphs 17 through 19 above,
HELMES met with HAYES in Neptune, New Jersey, and obtained 100 grams of
cocaine from HAYES.

97.    Later that night, at approximately 10:55 p.m., LOGAN sent
HELMES a text message stating: "Damn bro .. I really need some SHT .. been
dry since Friday..I'm behind on this money bro.. smh."  HELMES responded via

text message asking LOGAN "Wya." LOGAN replied via text message stating: "Home... This btch charging me 5000 but she didn't say if it's beatable or not... Too weight on me bro.. I don't wanna say FCK it but idk." Based on the context of these communications and others, I believe that LOGAN advised HELMES that he (LOGAN) was in need of a supply of narcotics because LOGAN had not had any narcotics to sell to his customers for the past several days, resulting in him being "behind on this money," apparently referring to the $5,000 LOGAN owed his attorney.

98.    A few minutes later, HELMES called LOGAN and asked if LOGAN was "in Long Branch." LOGAN responded affirmatively, and HELMES advised that he was on his way to meet with LOGAN.

99.    The investigation has also revealed that LOGAN regularly purchased quantities of crack cocaine from HELMES for redistribution, typically ordering 10 grams of crack cocaine at a time from HELMES.

100.   For example, on June 4, 2019, LOGAN and HELMES exchanged the following text messages:

| Sender | Recipient | Message |
|--------|-----------|---------|
| LOGAN | HELMES | Need Yu |
| HELMES | LOGAN | How many broski |
| LOGAN | HELMES | 10 |

101.   Based on the context and the investigation, I believe that LOGAN contacted HELMES and made arrangements to purchase 10 grams of crack cocaine from HELMES.

102.   Nearly an hour and a half later, HELMES called LOGAN and advised, "I'm on my way to you." LOGAN responded, "Alright, I'm at the house." Approximately forty minutes later, law enforcement observed HELMES arrive at the Long Branch Gardens apartment complex on North Bath Avenue in Long Branch, New Jersey, where LOGAN is believed to reside. HELMES parked his vehicle and entered the building for approximately five minutes, before exiting the building, returning to his vehicle and departing the area.

103.   On July 17, 2019, HELMES arranged and conducted a narcotics transaction with LOGAN. For instance, at approximately 2:37 p.m., HELMES received a text message from LOGAN stating: "need my usually bro." Based on the context of this communication and the investigation to date, I believe that when LOGAN advised that he needed his "usually," he was referring to the quantity of crack cocaine that he typically obtains from HELMES. Based on communications between LOGAN and HELMES intercepted both prior to and after this date, I believe that LOGAN typically orders 10 grams of crack cocaine at a time from HELMES.

104.  HELMES responded via text message to LOGAN approximately eight minutes later, stating: "omw" (meaning "on my way"). Then, at approximately 3:39 p.m., HELMES called LOGAN and asked, "Where you at, Bath?" LOGAN responded affirmatively. HELMES then stated, "I'm right here." LOGAN replied, "Alright." In fact, at approximately 3:40 p.m., law enforcement observed HELMES arrive at the Long Branch Gardens apartment complex in a silver Nissan Altima bearing Georgia license plates (the "silver Nissan Altima"). HELMES exited the silver Nissan Altima, approached the door to LOGAN's apartment, and entered the residence. Approximately five minutes later, HELMES exited LOGAN's apartment, got back into the silver Nissan Altima and departed the area.

105.  On July 19, 2019, at approximately 12:43 p.m., HELMES called LOGAN and asked if LOGAN "needed" him. LOGAN responded that he needed "just ten." HELMES replied, "Alright, say no more" and advised LOGAN to give him about half an hour. Based on the context of this conversation and others, I believe that LOGAN ordered 10 grams of crack cocaine from HELMES. Thereafter, at approximately 1:27 p.m., LOGAN called HELMES, who advised, "I'm on my way now" and "no longer than twenty minutes." LOGAN asked if he had time to go to "probation" in Ocean Township, New Jersey, first. HELMES responded, "That's even better, cuz I'm in Neptune." LOGAN replied, "Alright" and asked if HELMES wanted "to meet over that way." HELMES responded affirmatively.

106.  Approximately thirty minutes later, at around 1:57 p.m., HELMES called LOGAN and inquired as to LOGAN's whereabouts. LOGAN responded that he was just about to leave Long Branch now, and asked HELMES if he wanted to meet "over at the outlet" because "it might be safer over there." HELMES advised that he was "about to go over to the Walmart." LOGAN responded, "Alright, that's even better" and agreed to meet with HELMES there. At approximately the same time as this call, law enforcement observed LOGAN exit the Long Branch Gardens apartment complex and enter the front passenger seat of a gray and white Dodge van registered to DUDLEY. Law enforcement followed as DUDLEY and LOGAN drove to the Monmouth County Probation office in Ocean Township, and then to the Ocean Township Walmart located on Route 66.

107.  At approximately 2:49 p.m., LOGAN called HELMES and advised that he was "at Walmart." HELMES responded, "Alright, I'll be right there." Then, at approximately 2:57 p.m., LOGAN called HELMES. During this call, HELMES and LOGAN were attempting to locate each other in the Walmart parking lot. LOGAN advised that he was in "row six." HELMES responded, "I just seen you walking, I don't know where the fuck you went." HELMES then advised that he just turned down "row seven." LOGAN responded, "I see you ... come to your left." HELMES replied, "Alright" and, after a pause, asked

LOGAN, "Can you see me now?" LOGAN responded, "Yeah, I see you." At approximately the same time as this call, law enforcement observed LOGAN approach HELMES' vehicle, the silver Nissan Altima, and met briefly with HELMES in the Walmart parking lot.

108.    On July 31, 2019, HELMES arranged and conducted a narcotics transaction with LOGAN at the Long Branch Gardens apartment complex. At approximately 2:47 p.m., HELMES called LOGAN and advised, "I'll you soon as I get close." Nearly forty minutes later, at approximately 3:28 p.m., HELMES called LOGAN and advised that he would "be there in like five minutes." At approximately 3:39 p.m., HELMES called LOGAN and advised that he was at "the door." LOGAN responded, "I'm right behind you, yo, hold on." In fact, at approximately 3:39 p.m., law enforcement observed HELMES arrive at the Long Branch Gardens apartment complex in the silver Nissan Altima. HELMES exited his vehicle, approached the door to LOGAN's apartment, and entered the residence. Approximately three minutes later, at around 3:42 p.m., law enforcement observed HELMES exit LOGAN's apartment, get back into the silver Nissan Altima, and depart the area.

109.    Based on these communications and observations, as well as others, including a call between HELMES and LOGAN the next day as discussed below, I believe that HELMES met with LOGAN inside LOGAN's residence at the Long Branch Gardens apartment complex and engaged in a narcotics transaction involving an unknown quantity of crack cocaine.

110.    The next day, on August 1, 2019, at around 10:13 p.m., HELMES and LOGAN spoke over the telephone. During this call, HELMES advised LOGAN, "I was about to pull out your way real quick, see if you might need me, I know it's a day." LOGAN responded, "I just hit you yesterday." HELMES responded, "I know, but I thought about ...." LOGAN interrupted and told HELMES, "Bring me, um, give me ten since you coming. Fuck." HELMES replied, "Alright. Word is bond." LOGAN then stated, "I already got it, I just want to overflow myself." LOGAN then discussed how he had not been "on track with y'all cause I been falling back … It's like a lot of shit going on, you know what I mean, I'm cased up so I don't know, I gotta watch these motherfuckers." HELMES responded, "Yeah, safety always first my nigga." Later in the conversation, LOGAN advised, "Tomorrow we bury my uncle, so you know what I mean, that's why I been, I been kinda slow." HELMES responded, "Alright, say no more, I'm on my way."

111.    Based on the content of this call and others, I believe that HELMES advised LOGAN that he was coming to Long Branch and wanted to know if LOGAN needed to purchase any narcotics from him. LOGAN reminded HELMES that he had just purchased a quantity of crack cocaine from HELMES the previous day, which HELMES acknowledged. Nevertheless, LOGAN asked HELMES to bring him 10 grams of crack cocaine so that LOGAN could

"overflow" himself. HELMES agreed and told LOGAN that he was on his way to meet LOGAN. Later in the conversation, LOGAN discussed how he had been failing to stay "on track" with HELMES and had been "falling back," meaning that LOGAN had not been distributing as much narcotics as he needed to lately, because he had a lot of other things going on, including a recent death in the family. LOGAN and HELMES also discussed how LOGAN needed to be careful because he was "cased up," referring to his pending state court charges for possession of crack cocaine with intent to distribute.

### DUDLEY

112.   The investigation has revealed that DUDLEY frequently purchased narcotics from HELMES for further distribution.

113.   For instance, on May 25, 2019, HELMES arranged and conducted a narcotics transaction with DUDLEY at DUDLEY's residence in Long Branch, New Jersey. At approximately 2:35 p.m., DUDLEY (using the DUDLEY 8887 Facility) called HELMES. During the conversation, DUDLEY told HELMES, "I need to see you, but I can't move around, so I'm going to be at home." DUDLEY explained that he had missed a court appearance on Monday and learned that there was a "bench warrant" out for his arrest. DUDLEY then advised HELMES, "Let me count up and I'm a hit you, but you get it to me though because I definitely need you." HELMES responded, "Alright, say no more."

114.   Approximately five minutes later, DUDLEY (using the DUDLEY 8887 Facility) sent a text message to HELMES stating, "12." HELMES responded via text message less than a minute later stating, "Bet."

115.   Nearly an hour later, at approximately 3:33 p.m., HELMES called DUDLEY on the DUDLEY 8887 Facility and asked DUDLEY, "You home?" DUDLEY responded, "Yeah, I'm up here." HELMES then advised DUDLEY, "I'll be there in like one minute."

116.   Based on the context of these communications and others, I believe that DUDLEY made arrangements to purchase 12 grams of crack cocaine from HELMES, who delivered the narcotics to DUDLEY at DUDLEY's residence.

117.   On June 3, 2019, HELMES arranged and conducted another narcotics transaction with DUDLEY at DUDLEY's residence in Long Branch, New Jersey. At approximately 11:37 a.m., DUDLEY (using the DUDLEY 8887 Facility) called HELMES and advised that he (DUDLEY) was on his "way back now" – likely referring to Long Branch. HELMES responded that it would be "easier" for DUDLEY to come to HELMES "right now," and advised that he (HELMES) was in Asbury Park. DUDLEY advised that he could not do that

because he was not "driving." DUDLEY asked if HELMES would be willing to meet with him later, either at DUDLEY's residence or elsewhere in Long Branch. HELMES then asked DUDLEY, "How many, bro?" Dudley responded, "I'm about to text you."

118.   Thereafter, at approximately 12:47 p.m., DUDLEY (using the DUDLEY 8887 Facility) sent two text messages to HELMES, which were not intercepted by law enforcement. However, based on the context of the previous call, as well as numerous other communications and interactions between HELMES and DUDLEY, I believe that DUDLEY texted HELMES messages indicating the amount of cocaine and/or crack cocaine DUDLEY wanted to purchase from HELMES.

119.   Then, at approximately 1:01 p.m., HELMES called DUDLEY on the DUDLEY 8887 Facility and said, "I'll be there in like five minutes." DUDLEY responded, "Alright" and stated that he would "be waiting downstairs if you want, I don't care." HELMES responded, "Alright" and advised DUDLEY that he (HELMES) needed "the box." Based on my training, experience, and conversations with other experienced narcotics investigators, "box" is a term commonly used by persons involved in the illicit drug trade to refer to a scale used to weigh illegal narcotics.

120.   At approximately 1:05 p.m., law enforcement observed HELMES arrive outside DUDLEY's residence on Franklin Avenue in Long Branch (the "Franklin Avenue Residence") in a rented white Jeep Cherokee bearing New York license plates (the "white Jeep Cherokee"). A short time later, law enforcement observed an individual, later identified as DUDLEY, exit the Franklin Avenue Residence, approach the passenger side of the white Jeep Cherokee, and meet with HELMES.

121.   On July 15, 2019, at around 12:18 p.m., DUDLEY (using the DUDLEY 5869 Facility) sent HELMES two text messages stating "Gotta see u" and "Asap." Then, at approximately 12:19 p.m., HELMES called DUDLEY on the DUDLEY 5869 Facility, who asked if HELMES "could get out here early" for DUDLEY. HELMES asked DUDLEY, "What you wanted?" DUDLEY answered, "Twenty." HELMES responded, "I'm on my way."

122.   DUDLEY (using the DUDLEY 5869 Facility) and HELMES communicated further regarding when and where to meet. Later that afternoon, at approximately 1:36 p.m., HELMES texted DUDLEY, "Wya" (meaning "Where you at?"). DUDLEY responded, "Home." At approximately 2:59 p.m., DUDLEY texted HELMES, "Waiting on u gotta bread make it 5 and it wasn't 6 bro tighten up." A few minutes later, DUDLEY called HELMES, who advised "It was five point seven." DUDLEY responded by saying something unintelligible and laughing. HELMES then stated, "Three points off ... you crying about that?" Later in the conversation, DUDLEY told HELMES, "make it

the power and I got the what's his name." DUDLEY also pressed HELMES to text him "a timing" as to when HELMES would arrive for the transaction. HELMES responded that he was unable to "do all that" at the moment, but assured DUDLEY "I got you." Nearly six hours later, at around 8:51 p.m., HELMES called DUDLEY and inquired as to DUDLEY's location. DUDLEY responded that he had not moved "at all." HELMES replied, "I'm coming upstairs."

123. Based on the context of these communications and the investigation, I believe that DUDLEY initially made arrangements to purchase 20 grams of crack cocaine from HELMES. Later, DUDLEY advised HELMES via text message that he was at "Home." Thereafter, DUDLEY appeared to have changed his order to 5 grams when he texted HELMES "make it 5." DUDLEY and HELMES also discussed a prior drug transaction in which DUDLEY had ordered 6 grams, but only received 5.7 grams from HELMES. HELMES then met DUDLEY at DUDLEY's residence in Long Branch at approximately 8:51 p.m.

124. On August 6, 2019, DUDLEY (using the DUDLEY 5869 Facility) and HELMES made arrangements for HELMES to sell DUDLEY both powder and crack cocaine. At approximately 9:28 p.m., HELMES called DUDLEY and advised that he was about to "come that way." HELMES asked DUDLEY, "You need me?" DUDLEY responded affirmatively and asked of HELMES had it "both ways," meaning both powder and crack cocaine. HELMES' response was unintelligible, and DUDLEY replied, "Say no more." Nearly an hour later, at approximately 10:21 p.m., HELMES called DUDLEY, who advised that he was at his aunt's residence "waiting on" HELMES. HELMES responded, "I'll be right there."

***WILLIAMS***

125. The investigation has revealed that WILLIAMS frequently purchased narcotics from HELMES for further distribution.

126. On May 15, 2019, at approximately 7:38 p.m., WILLIAMS called HELMES, who asked "You need me?" WILLIAMS responded, "Yeah. Word is bond. Ten Newports." HELMES replied, "Alright, I got you." Based on the context of this call and others, I believe that WILLIAMS, using coded language, made arrangements to purchase 10 grams of cocaine or crack cocaine from HELMES.

127. Nearly an hour later, at around 8:29 p.m., HELMES called WILLIAMS and instructed WILLIAMS to "hurry up." Approximately six minutes later, at around 8:35 p.m., law enforcement observed HELMES exit Building 200 at the Glassworks apartment complex in Cliffwood, where

HELMES resides, and meet with WILLIAMS in the parking lot just outside Building 200.

128.   In similar fashion, WILLIAMS placed orders for 10 grams of cocaine or crack cocaine from HELMES on May 2, 2019, May 28, 2019, June 3, 2019, and July 22, 2019.

129.   On June 7, 2019, at approximately 12:34 p.m., WILLIAMS called HELMES and said, "I'm looking for eight."  HELMES responded, "Alright," and advised that he would be ready to meet with WILLIAMS in "less than an hour." WILLIAMS then asked HELMES, "What you feel comfortable with being able to like, kind of like, toss me?  Cuz the way it's flowing, I gotta get there with the numbers, but other than that [unintelligible] collect, that ain't no problem." HELMES responded, "Grab some [unintelligible], I'll throw shit to you.  That's a fact."  WILLIAMS replied, "Okay … Word is bond.  I did this shit before." HELMES responded "Word is bond, say that.  Give me like an hour.  I'll be up there."  WILLIAMS replied, "Alright, bet."

130.   Based on the context of this call and others, I believe that WILLIAMS contacted HELMES and made arrangements to purchase eight grams of cocaine or crack cocaine from HELMES.  WILLIAMS and HELMES discussed the possibility of WILLIAMS obtaining larger quantities of cocaine or crack cocaine from HELMES, possibly on consignment.  WILLIAMS explained that his narcotics distribution operation was "flowing," meaning going well and growing, and that he had "done this shit before," meaning WILLIAMS had a similar type of arrangement in the past with another supplier.

131.   At approximately 2:41 p.m., HELMES called WILLIAMS and advised that WILLIAMS could "pull up."  WILLIAMS responded, "Alright, bet." Approximately twenty minutes later, at around 3:01 p.m., WILLIAMS called HELMES, who advised that he would be "right down."  WILLIAMS responded, "Alright."

132.   Approximately nine minutes later, at around 3:10 p.m., law enforcement observed HELMES exit Building 200 at the Glassworks apartment complex in Cliffwood, and conduct a hand-to-hand transaction with WILLIAMS in the parking lot.

133.   On August 6, 2019, at approximately 7:58 p.m., HELMES called WILLIAMS and said, "Talk to me, I'm ready now."  WILLIAMS responded that he was at "the crib over in Ocean."  HELMES asked WILLIAMS "What you want?" and explained that he was "coming that way, eventually."  WILLIAMS responded that he wanted "seven."  HELMES stated, "Alright.  Just answer the phone.  I'll be out there."  WILLIAMS then asked if HELMES wanted his address.  HELMES responded, "No, not yet."  Based on the context of this call and others, I believe that WILLIAMS made arrangements to purchase seven

grams of cocaine or crack cocaine from HELMES.  HELMES agreed to the sale and advised that he would bring the narcotics to WILLIAMS at WILLIAMS' "crib," meaning his residence, in Ocean Township, New Jersey.

134.  A couple of hours later, approximately 9:59 p.m., HELMES called WILLIAMS and asked for WILLIAMS' address in Ocean Township.  WILLIAMS responded by providing HELMES with a specific address in the "Continental Gardens" apartment complex, explaining that "as soon as you turn in, you make the first right." HELMES advised that he would be there "in a few minutes."

135.  At approximately 10:08 p.m., HELMES called WILLIAMS and advised that he "just pulled into the first right when I turned in."  HELMES then asked WILLIAMS if that was "the right one."  WILLIAMS responded affirmatively.  HELMES then asked WILLIAMS to "come outside" so HELMES could see WILLIAMS.  WILLIAMS responded, "Alright, bet."

### UNDERWOOD

136.  The investigation has revealed that UNDERWOOD conspired with HELMES to distribute crack cocaine by, for example, allowing HELMES to use her residence to manufacture and package crack cocaine following a meeting between COPELAND and HELMES on May 29, 2019 as set forth in paragraphs 49 through 51 above.

137.  UNDERWOOD also frequently purchases narcotics from HELMES for further distribution.  On May 1, 2019, at approximately 12:44 p.m., UNDERWOOD (using the UNDERWOOD 1994 Facility) called HELMES, inquired as to HELMES' whereabouts and said "we need you," referring to herself and another unidentified female whose voice was audible in the background on UNDERWOOD's side of the call.  HELMES said that he was in "Neptune" and asked what they needed.  UNDERWOOD responded, "she needs 5 and then she needs, um, 40 of bud."  HELMES replied, "I'm on my way" and instructed UNDERWOOD and her companion to meet him at the "Dunkin Donuts in Keyport."  UNDERWOOD then asked HELMES to "tell us when you get closer so we can go over there."

138.  Based on the investigation and the context of these communications, I believe that UNDERWOOD, acting on behalf of her unidentified female companion, made arrangements to purchase 5 grams of crack cocaine and forty dollars' worth of "bud," or marijuana, from HELMES. Based on my training, experience, and conversations with other experienced narcotics investigators, I know that "bud" is a term commonly used by persons involved in the illicit drug trade to refer to marijuana.

139.   At approximately 1:08 p.m., HELMES called UNDERWOOD (using the UNDERWOOD 1994 Facility) and told UNDERWOOD, "come on, y'all can come now." UNDERWOOD replied, "Okay, I'm coming." Then, at approximately 1:32 p.m., HELMES called UNDERWOOD (utilizing the UNDERWOOD 1994 Facility), who advised HELMES that she was at the Dunkin Donuts in Keyport. HELMES responded that he would "be right there."

140.   At approximately 1:35 p.m., law enforcement observed UNDERWOOD meet with HELMES in the parking lot of the Keyport Dunkin Donuts. HELMES arrived in the black Dodge Challenger, and UNDERWOOD arrived in her vehicle, a Nissan Altima bearing New Jersey license plate L37KLC. UNDERWOOD exited her vehicle, approached the black Dodge Challenger, and engaged in a hand-to-hand transaction with HELMES through the passenger-side window of his vehicle.

141.   On May 3, 2019, at approximately 4:36 p.m., HELMES called UNDERWOOD on the UNDERWOOD 1994 Facility. During the conversation, UNDERWOOD asked HELMES, "Where you at?" HELMES responded that he was "coming into town" and asked UNDERWOOD what she wanted. UNDERWOOD stated that she wanted "the jumpies." HELMES asked, "How many you want?" UNDERWOOD responded, "Ten." HELMES stated "Alright" and instructed UNDERWOOD to meet him at "the Temple" in "like ten minutes."

142.   Based on the context of this call and others, I believe that UNDERWOOD likely made arrangements to purchase either 10 grams of crack cocaine or 10 ecstasy pills from HELMES. HELMES agreed to the sale and instructed UNDERWOOD to meet him at the "Temple," a former Masonic Lodge in Cliffwood, New Jersey.

143.   At approximately 5:01 p.m., UNDERWOOD (using the UNDERWOOD 1994 Facility) called HELMES, who advised that he was "pulling up in like one minute." UNDERWOOD then asked if HELMES was in his car. HELMES responded, "yeah, I'm gonna be in my car." A few minutes later, at approximately 5:07 p.m., law enforcement observed HELMES meeting with UNDERWOOD inside of her vehicle in the parking lot area of the former Masonic Lodge in Cliffwood.

144.   On May 13, 2019, at approximately 3:18 p.m., UNDERWOOD (using the UNDERWOOD 1994 Facility) called HELMES and asked if he was "in the area." HELMES responded that he was on his way "out there." UNDERWOOD then stated that "Michelle needs you. Well, I'm getting it for Michelle." HELMES responded, "Alright, you gotta give me a second though … I ain't got that with me. But I got you. Give me about an hour and a half." UNDERWOOD replied, "Okay, that's good cause that's when I'll need it and she wants five." HELMES responded, "Alright … I got you."

40

145.   Based on the context of this communication and others, I believe that UNDERWOOD contacted HELMES on behalf of "Michelle," TORREZ, and made arrangements to purchase 5 grams of crack cocaine from HELMES on TORREZ's behalf.  HELMES agreed to the sale and advised UNDERWOOD that he would be ready to meet her for the transaction in approximately an hour and a half.

146.   A few hours later, at approximately 6:30 p.m., HELMES called UNDERWOOD on the UNDERWOOD 1994 Facility and inquired as to UNDERWOOD's whereabouts.  UNDERWOOD responded that she was "at the light" by the Walgreens near her house.  HELMES instructed UNDERWOOD to "go straight to the apartment."

147.   Approximately fourteen minutes later, UNDERWOOD (using the UNDERWOOD 1994 Facility) called HELMES and warned him to "be careful" because there was an "all black Cherokee ... all tinted out" with a "white guy driving it."  UNDERWOOD advised HELMES of her belief that this individual was an "undercover" police officer, explaining that this vehicle was the same vehicle that had been in her apartment complex and had followed "Ralph and Kevin from the apartment complex."  UNDERWOOD then described the location of the vehicle inside the apartment complex's parking lot and told HELMES to "just be careful."

148.   Based on the context of this communication and the investigation, I believe that UNDERWOOD spotted law enforcement surveillance in the parking lot of the Glassworks apartment complex, and called to warn HELMES about the law enforcement presence.  Law enforcement was, in fact, conducting surveillance at the Glassworks apartment complex that evening, and one of the surveillance agents was operating the particular vehicle described by UNDERWOOD during this call with HELMES.

149.   About an hour later, UNDERWOOD (using the UNDERWOOD 1994 Facility) sent HELMES the following text messages:

| Sender | Recipient | Text |
|---|---|---|
| UNDERWOOD | HELMES | Hey listen FYI you need to change your number because it Ralph has it he's telling he just got pulled over the other day in a girls car driving and he had stuff |
| UNDERWOOD | HELMES | on him The car got impounded and he already has charges on him so he got out of it so he's telling |
| UNDERWOOD | HELMES | He also gave Michelle's apartment number so I'm just looking out for you and let you know |

| Sender | Recipient | Text |
|--------|-----------|------|
|  |  | what's up stop fucking with him we love you we love you and will try |
| UNDERWOOD | HELMES | to keep you safe |

150.   UNDERWOOD continued ordering narcotics from HELMES on a regular basis, generally ordering between 5 and 10 grams of crack cocaine at a time, and in one instance, 2 grams of "soft" (powder cocaine) on June 1, 2019. UNDERWOOD met HELMES for these transactions at various locations in and around the Matawan/Cliffwood area of Monmouth County on May 15, 2019 (5 grams of crack cocaine), May 21, 2019 (5 grams of crack cocaine), May 23, 2019 (5 grams of crack cocaine), May 24, 2019 (10 grams of crack cocaine), May 31, 2019 (5 grams of crack cocaine), June 1, 2019 (5 grams of crack cocaine and 2 grams of powder cocaine), July 7, 2019 (5 grams of crack cocaine), twice on August 1, 2019 (10 grams of crack cocaine each time), and on August 2, 2019 (10 grams of crack cocaine).

151.   On June 7, 2019, at approximately 1:08 p.m., UNDERWOOD (using the UNDERWOOD 5895 Facility) called HELMES and asked if HELMES would be "around in like fifteen minutes." HELMES responded that he was "in Long Branch right now" but was "heading back that way." UNDERWOOD then told HELMES, "I need to see you." HELMES asked, "How many?" UNDERWOOD responded, "five," meaning 5 grams of crack cocaine. HELMES replied, "Alright."

152.   Thereafter, HELMES and UNDERWOOD exchanged several telephone calls, mostly concerning when and where to meet. At approximately 2:48 p.m., UNDERWOOD called HELMES, who instructed UNDERWOOD to "come to the apartments, around the back." UNDERWOOD responded, "Alright, I'll be right there."

153.   At approximately 2:56 p.m., law enforcement observed UNDERWOOD arrive at the Glassworks apartment complex in her Nissan. Approximately three minutes later, UNDERWOOD called HELMES, but before she could say anything HELMES said "I already know." UNDERWOOD responded, "Oh, okay." At approximately the same time as this call, law enforcement observed HELMES exit the black Dodge Challenger, approach UNDERWOOD's vehicle, and conduct a hand-to-hand transaction with UNDERWOOD. UNDERWOOD then departed the area in her vehicle.

154.   On August 3, 2019, at approximately 1:37 p.m., UNDERWOOD (using the UNDERWOOD 0597 Facility) called HELMES and asked, "Where you at?" HELMES responded that he was in Keansburg. UNDERWOOD asked, "Are you coming back this way later?" HELMES responded that he was not, but told UNDERWOOD that she "could come out here." UNDERWOOD replied, "Alright, I'm going to need, um, gimme, uh, fifteen. Is the same price? Six

hundred?" HELMES responded affirmatively and instructed UNDERWOOD to "come on." UNDERWOOD then asked where HELMES was located in Keansburg. HELMES responded that he was "by the waterpark" and instructed UNDERWOOD to "just call me when you get by the waterpark." UNDERWOOD replied, "Okay, alright, alright, bye."

155.   Based on the context of this call and others, I believe that UNDERWOOD made arrangements to purchase 15 grams of crack cocaine from HELMES in exchange for $600. HELMES agreed to the transaction and instructed UNDERWOOD to meet him "by the waterpark" in Keansburg.

156.   Then, at around 2:02 p.m., UNDERWOOD (using the UNDERWOOD 0597 Facility) called HELMES and advised, "I'm coming, I'm on my way." HELMES responded, "Alright."

### *TORREZ*

157.   TORREZ frequently purchases crack cocaine from HELMES for redistribution, and on at least one occasion purchased 7.5 grams of powder cocaine from HELMES.

158.   For instance, on June 12, 2019, TORREZ contacted HELMES and made arrangements to meet HELMES in the parking lot of the Glassworks apartment complex in Cliffwood, where HELMES resides, for the purpose of purchasing 10 grams of crack cocaine from HELMES.

159.   In similar fashion, TORREZ placed orders of 10 grams of crack cocaine from HELMES on June 6, 2019, July 8, 2019, August 1, 2019, and August 5, 2019.

160.   On July 15, 2019, at approximately 12:09 p.m., TORREZ sent HELMES a text message stating: "Good morning can I see u just 5." A few minutes later, at approximately 12:13 p.m., HELMES called TORREZ and informed her that "You might want to get the ten cuz its runnin real, real low." TORREZ responded, "I know, but, I only got the three, right now, so I gotta wait cuz I got a couple more left and I don't wanna, um, you know what I mean." HELMES replied, "Alright, well listen, give me about ten minutes and I'll, um, figure out where I can meet you at." TORREZ responded, "Okay."

161.   Based on the context of these communications and others, I believe that TORREZ made arrangements to meet with HELMES for the purpose of purchasing 5 grams of crack cocaine from HELMES at a price of $300, or $60 per gram. HELMES informed TORREZ that she may want to "get the ten," meaning 10 grams, because his supply was running low. TORREZ indicated that she only needed 5 grams of crack cocaine from HELMES because she only had "the three right now," likely meaning $300, and she still

43

had "a couple left," likely meaning that she still had a couple of grams of crack cocaine left over from the last time she met with HELMES. HELMES agreed to sell TORREZ the 5 grams of crack cocaine and advised that he would let her know where to meet him shortly.

162. Approximately fifteen minutes later, at around 12:28 p.m., HELMES called TORREZ and advised her to "Come on, come to the apartments, come around back though." TORREZ asked, "By the mailbox?" HELMES responded affirmatively.

163. Approximately five minutes later, at around 12:33 p.m., TORREZ texted HELMES, "I'm here." HELMES responded via text message less than a minute later stating, "ok."

164. At approximately 12:40 p.m., law enforcement observed TORREZ arrive at the Glassworks apartment complex in a black Nissan Altima, bearing New Jersey license plate T21LEX, and park her vehicle behind Building 200. Thereafter, law enforcement observed HELMES in the front passenger seat of a vehicle being operated by a female, identified as Tanaya Laing, who is believed to be HELMES' girlfriend. Laing drove HELMES to the area of the parking lot where TORREZ was waiting in her vehicle. HELMES then exited his vehicle, and entered TORREZ's vehicle. Approximately one minute later, HELMES exited TORREZ's vehicle and walked back over to the vehicle being operated by Laing.

165. In similar fashion, TORREZ placed orders of 5 grams of crack cocaine from HELMES on July 20, 2019, July 21, 2019, July 23, 2019, and July 28, 2019.

166. The investigation has also revealed that TORREZ redistributes the cocaine and crack cocaine she purchases from HELMES. For example, on July 31, 2019, at approximately 1:22 p.m., TORREZ called HELMES and asked HELMES, "You around?" HELMES responded affirmatively. TORREZ then advised that she needed to go "get money" from another female and would text HELMES when she was "done seeing her." HELMES responded, "Alright." Approximately fifteen minutes later, at around 1:37 p.m., HELMES and TORREZ exchanged the following text messages:

| Sender | Recipient | Text |
|--------|-----------|------|
| TORREZ | HELMES | I'm at the mailboxes |
| HELMES | TORREZ | how many |
| TORREZ | HELMES | 5 |
| HELMES | TORREZ | ok |

167. Based on the context of these communications and others, I believe that TORREZ made arrangements to meet with HELMES for the

purpose of purchasing 5 grams of crack cocaine from HELMES. In the initial call between TORREZ and HELMES, TORREZ noted that she needed to go "get money" from an unidentified female co-conspirator before the transaction, likely meaning that this person owed TORREZ money from prior narcotics transactions or that TORREZ was obtaining the narcotics from HELMES for this individual.

168. At approximately 1:41 p.m., law enforcement observed TORREZ arrive in the parking lot of the Glassworks apartment complex in the same black Nissan Altima from the July 15, 2019 transaction. TORREZ parked her vehicle behind Building 200, near the mailboxes. Shortly thereafter, HELMES exited Building 200 and entered TORREZ's vehicle. Approximately two minutes later, HELMES exited TORREZ's vehicle and walked back into Building 200 as TORREZ departed the area.

169. On August 2, 2019, TORREZ and HELMES arranged and conducted a narcotics transaction for 7.5 grams of powder cocaine. At approximately 1:38 p.m., TORREZ called HELMES and stated "I need soft." HELMES advised, "I got five of 'em, but if you gonna get 'em you better get them shits now" because he was about to leave. TORREZ responded that she was "gonna come now to get it." HELMES replied, "Alright, come on." Approximately one minute later, HELMES called TORREZ back and advised, "Yo, it's seven and a half. You want it, the whole seven and a half?" TORREZ asked, "How much is that?" HELMES responded "I ain't gonna blast you because you rocking with me," and after a short pause advised, "Gimme three thirty." TORREZ replied, "Alright."

170. Based on the context of these communications and others, I believe that TORREZ contacted HELMES and, initially, made arrangements to purchase 5 grams of "soft," or powder cocaine, from HELMES. Thereafter, HELMES called TORREZ and advised that he actually had 7.5 grams of powder cocaine left to sell and offered to sell it to TORREZ at a reduced price of $330 because TORREZ was "rocking" with HELMES, meaning that TORREZ frequently purchases her narcotics from HELMES.

171. A short time later, at approximately 1:47 p.m., TORREZ texted HELMES, "I'm at the side door." HELMES responded via text message to TORREZ approximately one minute later stating, "ok." Then, at approximately 2:00 p.m., law enforcement observed HELMES getting into TORREZ's black Nissan Altima in the parking lot just outside of Building 200 at the Glassworks apartment complex.

**CONOVER**

172. The investigation has revealed that CONOVER conspires with HELMES to engage in narcotics trafficking. For instance, CONOVER permitted

HELMES to use her residence to convert powder cocaine into crack cocaine, as set forth in paragraphs 204 through 206 below. In addition, after HELMES obtained 100 grams of cocaine from COPELAND on June 10, 2019, as detailed in paragraphs 35 through 38 above, HELMES called CONOVER at approximately 11:49 a.m. and advised, "I need to use your facility." CONOVER responded, "Okay. Don't forget you don't have a Pyrex." HELMES replied, "I know," and advised CONOVER that he would arrive at her residence in approximately five minutes.

173. CONOVER also regularly purchases crack cocaine from HELMES for redistribution. For instance, on June 3, 2019, at approximately 11:42 p.m., CONOVER called HELMES and asked, "You around?" HELMES responded affirmatively. CONOVER then asked, "Can I come to you?" HELMES asked, "How many?" CONOVER responded, "Five." HELMES then advised CONOVER, "Come on." At approximately 12:08 a.m. on June 4, 2019, CONOVER called HELMES, who asked CONOVER if she was "here." CONOVER responded, "Yeah, I'm here. I'm by the park." HELMES then advised, "Alright, gimme like two minutes."

174. Based on the context of these communications and others, I believe that in the first call CONOVER made arrangements to meet HELMES for the purpose of purchasing 5 grams of crack cocaine from HELMES. In the second call, CONOVER advised that she was "here … by the park." Based on physical surveillance of HELMES' transactions and meetings with others at the Glassworks apartment complex in Cliffwood, I am aware that the building in which HELMES resides, Building 200, is located next to a park and playground known as Glassworks park, and that HELMES often meets co-conspirators "by the park" when conducting narcotics transactions at the Glassworks apartment complex.

175. Later that same night, on June 4, 2019, at approximately 8:21 p.m., CONOVER and HELMES spoke on the telephone and HELMES asked CONOVER, "How many?" CONOVER responded, "Two for right now," meaning 2 grams of crack cocaine. HELMES replied, "I'm about to head that way in about thirty minutes." CONOVER responded, "Alright, I'm home." Based on the context of this call and others, I believe that CONOVER and HELMES made arrangements to meet for the transaction at CONOVER's residence. Based on physical surveillance, intercepted communications, and other evidence gathered over the course of the investigation, I know that CONOVER resides in South Amboy (Laurence Harbor), New Jersey.

176. Approximately ten minutes later, at around 8:31 p.m., CONOVER called HELMES and advised, "Make it three," meaning 3 grams of crack cocaine. HELMES responded, "Alright."

177.   Nearly three hours later, at around 11:23 p.m., HELMES called CONOVER and advised, "I'll be there in like three minutes, five minutes at the most."  CONOVER responded, "Alright."

178.   In similar fashion, CONOVER ordered various quantities of crack cocaine from HELMES on June 5, 2019 (2 grams), June 6, 2019 (4 grams), June 8, 2019 (5 grams), June 9, 2019 (4 grams), July 6, 2019 (5 grams), July 7, 2019 (5 grams), July 9, 2019 (two separate orders of 3 grams), July 12, 2019 (3 grams), July 14, 2019 (two separate orders of 3 grams), July 20, 2019 (3 grams), July 29, 2019 (3 grams), and August 7, 2019 (3 grams).

179.   On July 16, 2019, at approximately 1:06 p.m., CONOVER called HELMES and asked, "Are you around?"  HELMES responded affirmatively. CONOVER then asked, "Do you want me to come to you?"  HELMES asked, "What you wanted?"  CONOVER replied, "Three," meaning 3 grams of crack cocaine.  HELMES responded, "Give me about ten minutes, I'll let you know where to go."

180.   Thereafter, at approximately 1:15 p.m., CONOVER texted HELMES asking, "Were am I goin."  Approximately ten minutes later, at around 1:25 p.m., CONOVER called HELMES, who instructed her to "Come to the Wendy's." Approximately eighteen minutes later, CONOVER texted HELMES, "Here." HELMES responded in a text approximately one minute later stating, "ok."

181.   At approximately 1:40 p.m., law enforcement observed CONOVER arrive in the parking lot of the Wendy's restaurant located in Keyport, New Jersey, operating a red Chevrolet Cruze bearing New Jersey license plates. Approximately five minutes later, law enforcement observed HELMES arrive at the Wendy's restaurant in a rented black Nissan Altima bearing New York license plates.  HELMES then exited his vehicle, approached the driver's side of CONOVER's vehicle, and conducted a hand-to-hand transaction with CONOVER.  HELMES then returned to his vehicle and both parties departed the area.

182.   The investigation also revealed that CONOVER obtained crack cocaine from HELMES for redistribution to others.  For instance, on July 30, 2019, between approximately 4:37 a.m. and 7:28 a.m., CONOVER and HELMES exchanged the following text messages, among others, setting up a narcotics transaction:

| Sender | Recipient | Text |
|--------|-----------|------|
| CONOVER | HELMES | Can I come c u |
| HELMES | CONOVER | call 1 hour how many |
| CONOVER | HELMES | 3 I can come 2 u |
| HELMES | CONOVER | Hour |

| Sender | Recipient | Text |
|--------|-----------|------|
| CONOVER | HELMES | Ok this person is leaving n wants b4 the leave 4 day |
| CONOVER | HELMES | R u around cam I come c u now real quick |
| CONOVER | HELMES | Did u fall back 2 sleep can I come c u b4 ride leaves |
| HELMES | CONOVER | come |
| CONOVER | HELMES | Here |
| CONOVER | HELMES | I'm here whata up |
| CONOVER | HELMES | This guy tryin 2 go to ac |
| CONOVER | HELMES | This is short .6 so u kno |
| HELMES | CONOVER | ok |

183.   Based on the context of these communications and others, I believe that CONOVER made arrangements to meet HELMES for the purpose of purchasing "3," or 3 grams of crack cocaine, from HELMES, and that CONOVER intended to distribute those 3 grams to another co-conspirator ("CC-5") who wanted the crack cocaine before he left to go to "ac," meaning Atlantic City, for the day.  Based on the timing of these text messages, I believe that CONOVER met HELMES for the transaction sometime between 6:55 a.m. (when she texted "This guy tryin 2 go to ac") and 7:27 a.m. (when she texted HELMES "This is short .6," meaning that HELMES only gave CONOVER 2.4 grams instead of the full 3 grams she had ordered).

**JENKINS**

184.   The investigation has revealed that JENKINS purchased both cocaine and crack cocaine from HELMES.

185.   On July 16, 2019, at approximately 12:41 p.m., HELMES called JENKINS, who asked HELMES, "Anything, anything?"  HELMES responded affirmatively.  JENKINS then advised that he was on his way home from work in Princeton and needed "the five."  Based on the context of this communication and others, I believe that JENKINS ordered 5 grams of crack cocaine from HELMES.

186.   Thereafter, at approximately 1:44 p.m., JENKINS called HELMES and advised that he was at his house, and that HELMES could come there for the transaction.  HELMES instructed JENKINS to text him the address.  At approximately 1:45 p.m., JENKINS sent a text message to HELMES providing an address in Keyport, New Jersey.  HELMES responded via text message to JENKINS, at approximately 2:06 p.m., stating: "bet."

187.  At approximately 3:09 p.m., HELMES called JENKINS and advised that he would be there in less than ten minutes.  Then, at approximately 3:25 p.m., HELMES called JENKINS, who advised HELMES to "come in" the gray house on the corner.

188.  At approximately the same time as this call, law enforcement observed HELMES arrive in front the location in Keyport that JENKINS provided in the earlier text message to HELMES in a black Nissan Altima bearing New York license plates.  Approximately three minutes later, law enforcement observed HELMES exit the residence, enter his vehicle and depart the area.

189.  On July 20, 2019, at approximately 2:18 p.m., JENKINS called HELMES, who asked JENKINS, "You need me?"  JENKINS responded, "Yeah, the five, I'm at the crib."  HELMES replied, "Alright, give me like thirty minutes."  Based on the context of this call and others, I believe that JENKINS made arrangements to purchase 5 grams of crack cocaine from HELMES, and that HELMES agreed to deliver the narcotics to JENKINS.

190.  Then, at approximately 2:59 p.m., JENKINS sent a text message to HELMES stating: "Lmk when you out side I'll run out."  At approximately 3:18 p.m., HELMES called JENKINS and stated, "I'm going to leave in like ten minutes, I'll be there in like maybe fifteen at the most, twenty at the max." Then, at around 4:23 p.m., HELMES called JENKINS and advised that he was outside.  JENKINS responded, "I'm about to come out."

191.  In fact, at approximately 4:23 p.m., law enforcement observed HELMES arrive at the same residence in Keyport in the silver Nissan Altima. Shortly thereafter, JENKINS exited the residence, approached the silver Nissan Altima, and met with HELMES.  Approximately two minutes later, HELMES departed the area in the silver Nissan Altima.

192.  On July 24, 2019, at approximately 5:40 p.m., JENKINS called HELMES, who advised JENKINS to "talk to" him.  JENKINS responded, "Both ways."  HELMES replied, "It all depends.  What you trying to do?"  JENKINS responded, "I need ten hard and three soft," meaning that he wanted 10 grams of crack cocaine and 3 grams of powder cocaine.  HELMES then asked, "Where you at?"  JENKINS responded, "I'm at the Woodbridge mall right now." HELMES replied, "So just come see me on your way back ... you gotta come this way."  JENKINS asked, "What way is that?"  HELMES responded, "Matawan ... soon as you get off the Matawan exit, come down motherfucking Cliffwood Avenue, I'm at the new apartments."  JENKINS then asked, "What's the [unintelligible] on ten and three?"  HELMES responded, "five twenty," meaning $520.  JENKINS replied, "Alright, say less."

193.   Thereafter, at approximately 6:21 p.m., JENKINS called HELMES and advised, "I'm outside bro." HELMES responded, "Alright, damn I need like ten minutes bro, I just ran to the store." HELMES then advised Jenkins, "Just pull around the back ... I'll be right there." JENKINS responded that he could not wait too long because he was there waiting "in a cab, like Uber type shit." HELMES instructed JENKINS, "Tell Uber to leave you, I'll give you a ride."

194.   Approximately eight minutes later, at around 6:29 p.m., JENKINS called HELMES, who advised, "I'll be there in like one minute broski." Approximately eight minutes later, at around 6:37 p.m., HELMES called JENKINS and inquired as to JENKINS' whereabouts. JENKINS advised that he was at "Anchor Way and something else, I'm at the end." HELMES asked, "The end of what? The complex?" JENKINS responded, "Yeah, I'm at 223 or something." HELMES replied, "Nah ... I stay in 200 ... come up by the park, walk up by the park." JENKINS advised, "I don't know where I'm at." HELMES instructed JENKINS to "just walk straight back up, like you going out, like you're headed out, you're going to see a park." JENKINS responded, "Okay."

195.   A few minutes later, at around 6:45 p.m., HELMES called JENKINS, who advised that he was now "standing outside by the park."

196.   In fact, at approximately 6:47 p.m., law enforcement observed JENKINS meeting with HELMES outside Building 200 in the Glassworks apartment complex. Both JENKINS and HELMES then entered the silver Nissan Altima and departed the Glassworks apartment complex.

***LEE***

197.   The investigation has revealed that LEE purchases cocaine from HELMES for redistribution.

198.   For instance, on April 30, 2019, at approximately 11:01 p.m., HELMES called LEE (using the LEE 6659 Facility). During this call, LEE stated to HELMES "Tonya told me you was looking for me." HELMES responded affirmatively and stated that he "wanted to see if" LEE "needed anything before" HELMES left the area. LEE replied "no, right now," but advised that he was "probably gonna get like ten" on May 3, 2019.

199.   Based on the context of this communication and others, I believe that LEE arranged a narcotics transaction with HELMES on May 3, 2019 for 10 grams of crack cocaine.

200.   On May 2, 2019, at approximately 6:25 p.m., LEE (using the LEE 6659 Facility) called HELMES and asked if HELMES was "around."  HELMES responded "Yeah, I'm about to head that way right now," and asked LEE, "You need me?"  LEE replied, "Yeah ASAP."  HELMES asked LEE, "What you need?"  LEE stated that he needed "five," meaning 5 grams of crack cocaine.  HELMES responded, "Alright, I'm on my way."

201.   A short time later, at approximately 6:50 p.m., HELMES called LEE on the LEE 6659 Facility and told LEE to meet him "over there by the temple," meaning the former Masonic Lodge at 191 County Road in Cliffwood.  Then, at approximately 7:02 p.m., LEE (using the LEE 6659 Facility) called HELMES, who asked LEE, "Where you at boy?"  LEE responded "I'm by Quick Check.  I'll be right there."  HELMES replied, "You gotta come on bro, I'm trying to move bro."  LEE responded, "Alright. My bad yo . . . I had to stop by to get some cash."

202.   On May 5, 2019, at approximately 6:41 p.m., HELMES called LEE on the LEE 6659 Facility.  During this call, LEE told HELMES, "I need to see you."  HELMES asked, "What you need?"  LEE responded, "I need five," meaning 5 grams of crack cocaine, and inquired as to HELMES' location.  HELMES said that he was in Matawan, and LEE agreed to come to HELMES for the transaction.   HELMES then advised LEE that "its soft," meaning powder cocaine, "you gotta put it together yourself."  LEE responded, "Alright, ain't no problem."  LEE asked if HELMES was "at the apartments," to which HELMES responded affirmatively.  LEE then stated, "Alright, I'll be right there."

203.   At approximately 7:13 p.m., LEE (using the LEE 6659 Facility) called HELMES and advised, "I'm about to pull in."  HELMES responded, "Come to the 7-Eleven, drive straight past, come to the 7-Eleven."   LEE responded, "Oh, okay, alright."

204.   On May 6, 2019, at approximately 10:43 p.m., HELMES called LEE on the LEE 6659 Facility and inquired as to LEE's location.   LEE responded that he was at "Betty's" home in "Laurence Harbor," New Jersey, with "Betty" and "Kevin."  HELMES told LEE that he (HELMES) needed "to do something."  LEE responded, "Shit . . . We ain't got no fucking measuring cup and shit."  HELMES then asked LEE, "do y'all got a pot and a frying pan?"  LEE responded affirmatively.  HELMES replied, "Alright," and instructed LEE to "text me the address."

205.  At approximately 10:45 p.m., LEE (using the LEE 6659 Facility) sent HELMES a text message with CONOVER's address in South Amboy (Laurence Harbor), New Jersey.  HELMES responded via text message, approximately five minutes later, stating: "Bet."

206.  Then, at approximately 11:04 p.m., LEE (using the LEE 6659 Facility) sent HELMES a text message asking: "You want the water on." HELMES responded via text message a short time later stating: "Yes."

207.  Based on the context of these communications and others, I believe that HELMES made arrangements to meet with LEE and "Betty," meaning CONOVER, at CONOVER's residence, to convert a quantity of powder cocaine into crack cocaine.

208.  On May 12, 2019, at approximately 8:00 p.m., LEE (using the LEE 3786 Facility) called HELMES and stated that he needed "two," meaning 2 grams of crack cocaine.  HELMES responded that LEE would have to wait until HELMES returned to the area, meaning the Matawan/Cliffwood area of Monmouth County.

209.  Later that day, at approximately 9:41 p.m., CONOVER called HELMES.  HELMES, apparently expecting to speak to LEE, answered "What up cuzzo?"  CONOVER then stated, "Hey" and asked if HELMES was "going to be around."  HELMES responded that he was "around now."  CONOVER then asked if HELMES could drop off "two" at her house.  HELMES advised, "Just call me when you ready, you might have to come to me."  CONOVER responded, "Alright, only because I know he," referring to LEE, "keeps calling you but it's mine," referring to the order for 2 grams of crack cocaine.

210.  Thereafter, between approximately 9:59 p.m. and 10:00 p.m., HELMES and LEE (using the LEE 3786 Facility) exchanged the following text messages:

| Sender | Recipient | Text |
|--------|-----------|------|
| LEE | HELMES | I need 5 cuz it's Ralph |
| HELMES | LEE | Apts |
| LEE | HELMES | Ok |

211.  Approximately seven minutes later, HELMES called CONOVER, who asked HELMES "Do you want me to come to you?"  HELMES responded, "Nah, I want Ralph to come to me, I never told you to come nowhere." CONOVER replied, "Oh, I'm not with Ralph right now." HELMES stated that he did not know CONOVER "like that," and that he deals with LEE.  CONOVER advised that LEE was "supposed to pick up money" from her and go to HELMES, "but I know I needed the two from mine … on top of whatever he's getting."  HELMES instructed CONOVER to tell "him," meaning LEE, "to call me," and explained "I don't even know you like that, why the fuck would I be talking to you about some shit."  CONOVER responded, "Alright."

212.  Thereafter, at approximately 10:19 p.m. and 10:20 p.m., LEE (using the LEE 3786 Facility) sent HELMES two text messages stating, "I'll be there in 20 minutes" and "please have it for me cuz."

213.  Approximately twenty-six minutes later, at around 10:46 p.m., CONOVER called HELMES and stated that LEE would be there in ten minutes. HELMES called CONOVER back approximately one minute later and asked "Why do you keep calling me?"  CONOVER responded, "Because he doesn't have his phone on him."  HELMES instructed CONOVER to stop calling him and to tell LEE that he would have to see HELMES "some other time, I don't do that third-party shit."

214.  A few minutes later, at around 10:53 p.m., LEE (using the LEE 1361 Facility) called HELMES and advised that he was "at the ATM at Quick Check" and would "be right there."  HELMES advised LEE that he would have to come see HELMES another time because LEE kept having "this white girl" call HELMES.  LEE explained that he did not have his phone with him, and HELMES hung up on LEE.

215.  Thereafter, between approximately 11:00 p.m. and approximately 11:02 p.m., LEE (using the LEE 1361 Facility) exchanged the following text messages with HELMES:

| Sender | Recipient | Text |
|--------|-----------|------|
| LEE | HELMES | I'm here dropping my boy off |
| LEE | HELMES | I can't see you real quick |
| HELMES | LEE | Wya |
| LEE | HELMES | Coming in the building |
| HELMES | LEE | Meet you downstairs |

216.  Based on the context of these communications and others, I believe that LEE ordered 2 grams of cocaine for CONOVER and, later, ordered an additional 5 grams of crack cocaine for himself.  CONOVER then contacted HELMES directly in an apparent attempt to get her 2 grams quicker.  This angered HELMES, who did not "know" CONOVER "like that" at the time, and HELMES threatened to call off the transaction.  However, HELMES ultimately relented and met with LEE "downstairs" at the Glassworks apartment complex.

**HICKS**

217.  The investigation has revealed that HICKS purchased cocaine and/or crack cocaine from HELMES for redistribution.  For instance, on July 9, 2019, at approximately 1:04 p.m., HELMES called HICKS and said, "That's me right there."  HICKS acknowledged and asked HELMES, "I told you ten right?"  HELMES responded affirmatively and stated "I got you."

218.  A few minutes later, at approximately 1:11 p.m., HELMES called HICKS and advised HICKS that "it's, um, two separate powers … they tied up and clipped … I put both of 'em inside one big bag … so when you get it you know it's already tied up and clipped."  HICKS responded, "Alright.  Say no more."

219.  Based on the context of these communications and others, I believe that in the first call HELMES and HICKS were about to meet in person when HELMES advised HICKS, "That's me right there."  HICKS acknowledged and asked if he had told HELMES that he needed "ten," meaning 10 grams of cocaine or crack cocaine.  HELMES responded affirmatively.  In the second call between HELMES and HICKS, HELMES advised that he had given HICKS "two separate powers" that were "tied up and clipped … inside one big bag."  Based on my training, experience, and conversations with other experienced narcotics investigators, I know that the word "power" is code for the number five.  Thus, in this call, HELMES advised HICKS that there were two separate 5-gram bags of cocaine or crack cocaine that were "tied up and clipped" inside the "one big bag" that HELMES had given to HICKS when they met a few minutes earlier.

220.  On July 16, 2019, at approximately 3:38 p.m., HICKS called HELMES, who advised HICKS to meet him at his aunt's house located on Milton Avenue near the Popeye's restaurant.  HICKS agreed to meet HELMES there and advised HELMES, "I got that four dollars."  HELMES responded,

"Alright, say no more."  HICKS then asked, "You know what I'm talking [unintelligible]?"  HELMES replied, "Yeah, I know.  Word is bond."

221.    Based on the context of this call and others, I believe that HICKS made arrangements to meet with HELMES for the purpose of purchasing a quantity of cocaine or crack cocaine from HELMES.  Specifically, HICKS advised HELMES that he had "that four dollars," which I believe is code for either $400 worth of narcotics or 4 grams of cocaine/crack cocaine.

222.    At approximately 3:58 p.m., law enforcement observed HELMES arrive at the Milton Avenue residence in Neptune, New Jersey in a black Nissan Altima.  HELMES then approached a light blue Buick bearing New Jersey license plates, being operated by HICKS, and conducted a hand-to-hand transaction with HICKS.  Thereafter, both parties departed in their respective vehicles.

223.    Then, at approximately 3:59 p.m., HICKS called HELMES and warned him that there were two individuals sitting in a vehicle that was "posted facing towards" HELMES and that "it looked like the driver had binoculars."  HELMES, responded "Yeah, I seen 'em right there."  HELMES asked "it's a black car right?"  HICKS responded, "It's a black truck."  HELMES then stated, "Yeah, ain't nobody in there, oh yes it is, yes it is."  HICKS responded, "There's two of them in there."  HELMES stated, "Word is bond, and he tried to turn his head."  HICKS then stated, "Bro got binoculars."  HELMES replied, "I already know" and "good looking broski."  HICKS then advised, "When I pulled the corner, he put them down though.  So just be on fifty, you heard?"  HELMES responded, "Alright, say no more."

224.    Based on the context of this call, I believe that HICKS spotted law enforcement agents who were conducting surveillance in the area as HICKS was leaving from his meeting with HELMES in front of 1921 Milton Avenue, and called HELMES to advise him of the law enforcement presence.

225.    On July 22, 2019, at approximately 1:14 p.m., HELMES called HICKS, and the two agreed to meet in Red Bank,  HICKS advised HELMES, "Listen, they wasn't really crazy off the [unintelligible], you heard."  HELMES asked, "That last one?"  HICKS responded, "Yeah, they wasn't really off that, you know what I mean."  HELMES replied, "Alright, they'll love this one."  HICKS then stated, "I'm just gonna grab power off you right now."  HELMES responded, "Alright, say no more

226.    Based on the context of this call and others, I believe that HICKS made arrangements to meet with HELMES in Red Bank for the purpose of purchasing "power," or 5 grams of cocaine or crack cocaine.  HICKS also advised HELMES that HICKS' customers did not particularly like the quality of the cocaine/crack cocaine that HICKS obtained from HELMES on a previous

occasion.  HELMES responded that "they'll love this one," meaning that the quality of the cocaine/crack cocaine he just agreed to sell to HICKS was much better than the last batch.

227.   Thereafter, at around 1:49 p.m., HELMES sent HICKS a text message stating, "im out bro," meaning that HELMES was ready to meet with HICKS.  Approximately six minutes later, HICKS called HELMES and the two agreed to meet at a liquor store near the corner of Leighton Avenue and Newman Springs Road in Red Bank.

228.   At approximately 2:00 p.m., law enforcement observed HICKS sitting in a light blue Buick parked at the Vingo liquor store on Newman Springs Road in Red Bank.  Approximately four minutes later, law enforcement observed HELMES arrive at the Vingo liquor store in the silver Nissan Altima, at which time both HELMES and HICKS exit their respective vehicles and enter the liquor store.  At approximately 2:08 p.m., law enforcement observed HELMES and HICKS exit the liquor store, enter their respective vehicles, and depart the area.

### ROGERS

229.   The investigation has revealed that ROGERS purchased both cocaine and crack cocaine from HELMES for redistribution.  For instance, on May 29, 2019, at approximately 5:10 p.m., ROGERS called HELMES and advised that he wanted to "go the same route."  HELMES responded, "You gotta go seven or better."  ROGERS said, "Okay, I can do that too though, I can go to ten" but noted that HELMES had "shorted" him "one the last time."  HELMES responded, "So, I'm bringing you eleven, that's what you telling me?"  ROGERS replied, "True."  HELMES responded, "Alright" and inquired as to ROGERS' location.  ROGERS said that he was "up at the same spot."  HELMES acknowledged and advised ROGERS that he would be there in "like an hour."

230.   Approximately two hours later, at around 7:10 p.m., ROGERS called HELMES and asked, "We going both directions ain't we?"  HELMES then asked, "How you want it?"  ROGERS responded, "Both directions."  HELMES then asked, "So you want it soft and hard?"  ROGERS responded affirmatively.  HELMES acknowledged and again asked "How you want it?"  ROGERS responded, "Half and half."  HELMES replied, "Alright."  ROGERS then advised that he was at his "mom's."  HELMES responded, "Alright.  Stay right there.  I'll be there in like five minutes."

231.   Based on the context of these communications and others, I believe that in the first call ROGERS made arrangements to purchase "ten," meaning 10 grams of crack cocaine from HELMES.  ROGERS first attempted to order an unknown quantity by telling HELMES that he wanted to "go the same route," likely referring to a quantity of crack cocaine he had purchased from

HELMES on a previous occasion.  HELMES, however, declined and advised that ROGERS would have to "go seven or better," meaning HELMES would not sell ROGERS anything less than 7 grams.  ROGERS then advised that he could "go ten," meaning 10 grams, but noted that HELMES had "shorted" him 1 gram during a previous transaction.  HELMES responded that he would bring ROGERS 11 grams this time and advised that he would be ready to meet with ROGERS in about an hour.  In the second call, ROGERS called Helmes and advised that he wanted "both directions," meaning he wanted both powder cocaine and crack cocaine.  HELMES then asked how ROGERS "want[ed] it," meaning how much of each type of cocaine ROGERS wanted.  ROGERS responded "half and half," meaning he wanted half of the 11 grams in powder cocaine and half in crack cocaine.

232.    Then, at approximately 7:31 p.m., HELMES called ROGERS and advised, "I'm outside."  ROGERS responded that he was on his way back there from McDonalds and that he would be "right there."  HELMES responded, "Why the fuck would you make me come here if you not here?"  ROGERS attempted to explain, but HELMES interrupted him and stated, "Listen to me bro, I'm trying not to lose my temper ... I don't take dumbass risks ... you gonna make me fuck you up bro, I'm not playing ... I don't be driving around ... what the fuck is wrong with you?"  ROGERS again advised that he would be "right there."  HELMES instructed ROGERS to "hurry up."

233.    On July 15, 2019, at approximately 6:24 p.m., HELMES called ROGERS, who asked if HELMES had any "product."  HELMES responded that he had "everything."  ROGERS then stated, "Let me get the five," meaning 5 grams of crack cocaine.  HELMES replied "Alright" and inquired as to ROGERS' whereabouts.  ROGERS advised that he was "by my mom's shit."  HELMES responded, "Alright, be like fifteen minutes."  Based on the context of this call and others, I believe that ROGERS made arrangements to purchase 5 grams of crack cocaine from HELMES.

234.    Approximately thirty minutes later, at around 6:53 p.m., ROGERS called HELMES, who advised that he was just about to leave his residence to come meet with ROGERS and that he would be there in less than five minutes.

235.    At approximately 7:05 p.m., law enforcement observed HELMES pull into the parking lot area of the former Masonic Lodge in Cliffwood, which is adjacent to ROGERS' mother's residence.  At that time, law enforcement observed ROGERS exit a nearby residence, walk up to HELMES' vehicle, and conduct a hand-to-hand transaction with HELMES.  HELMES then departed the area at approximately 7:07 p.m.  Approximately three minutes later, law enforcement observed ROGERS get on a bicycle and travel down County Road to Bayview Street, where he met and conducted a hand-to-hand transaction with another male co-conspirator ("CC-6") driving a Chevrolet Blazer.

***HAUPT***

236.   The investigation has revealed that HAUPT purchased cocaine or crack cocaine from HELMES in furtherance of the conspiracy.  For instance, on May 22, 2019, between approximately 4:56 p.m. and approximately 4:58 p.m., HELMES and HAUPT (using the HAUPT 1035 Facility) exchanged the following text messages:

| Sender | Recipient | Text |
|---|---|---|
| HAUPT | HELMES | Need 10 just got off work |
| HELMES | HAUPT | Okay |
| HAUPT | HELMES | Ima hit u when I get 2the hood |

237.   Then, at approximately 7:32 p.m., HAUPT (using the HAUPT 1035 Facility) called HELMES, who advised, "Give me like thirty minutes bro." HAUPT responded, "Drop it to five" and advised "I'm out here."  HELMES replied, "Alright bro, I got you."

238.   Based on the context of these communications and others, I believe that, in the text-message conversation, HAUPT initially made arrangements to purchase 10 grams of cocaine or crack cocaine from HELMES. Approximately two and a half hours later, however, HAUPT called HELMES and advised "drop it to five," meaning that HAUPT changed his order to 5 grams from his initial order of 10 grams.

239.   Approximately nineteen minutes later, at around 8:45 p.m., law enforcement observed HELMES meeting with HAUPT on Ridge Avenue in Asbury Park, New Jersey.

240.   On June 7, 2019, between approximately 5:14 p.m. and approximately 5:20 p.m., HELMES and HAUPT (using the HAUPT 6729 Facility) exchanged the following text messages, among others:

| Sender | Recipient | Text |
|---|---|---|
| HAUPT | HELMES | Bro whatsgood wit 10 |
| HELMES | HAUPT | Wya |
| HAUPT | HELMES | U already kno on ridge bro |
| HELMES | HAUPT | Bet |

241.   Based on the context of these communications and others, I believe that HAUPT arranged to meet with HELMES on Ridge Avenue in Asbury Park for the purpose of purchasing 10 grams of cocaine or crack cocaine from HELMES.

242.   Thereafter, between approximately 7:31 p.m. and approximately 7:45 p.m., HELMES and HAUPT (using the HAUPT 6729 Facility) exchanged the following text messages, among others:

| Sender | Recipient | Text |
|--------|-----------|------|
| HAUPT | HELMES | Bro wya |
| HELMES | HAUPT | 5 mins |
| HAUPT | HELMES | Ok |
| HELMES | HAUPT | I'm outside |

243.   At approximately 7:46 p.m., law enforcement observed HELMES arrive on Ridge Avenue in the black Dodge Challenger.  A short time later, law enforcement observed HAUPT approach the black Dodge Challenger and conduct a hand-to-hand transaction with HELMES.

## *JONES*

244.   The investigation has revealed that JONES conspired with HELMES and others to engage in narcotics trafficking.  For instance, on May 10, 2019, at approximately 1:43 p.m., JONES (using the JONES 4363 Facility) called HELMES and asked if HELMES was "in Matawan?"  HELMES responded affirmatively.  JONES then asked if HELMES knew an individual he identified in the call.  HELMES responded, "Um, yeah, yeah."  JONES then advised, "Yeah, he out there somewhere, I'm about to find out and you can grab that bread from him for me?"  HELMES responded, "Word is bond, call him, find out."  JONES replied, "Alright, I'm going to call him right now."

245.   Based on this call and others, I believe that JONES asked HELMES to obtain money owed to JONES by another individual, likely a drug customer of JONES.

246.   Approximately six minutes later, at around 1:49 p.m., JONES (using the JONES 4363 Facility) called HELMES and asked, "Yo, where you at? You in the apartments?"  HELMES responded affirmatively.  JONES then advised, "They in there, they about to pull in there right now they said."  HELMES responded, "Alright, say no more."

247.   Then, between approximately 2:30 p.m. and approximately 5:57 p.m., HELMES and JONES (using the JONES 4363 Facility) exchanged the following text messages:

| Sender | Recipient | Text |
|--------|-----------|------|
| JONES | HELMES | U get that |
| HELMES | JONES | True indeed Lord |
| HELMES | JONES | He said he owe you 10 cash tho |
| JONES | HELMES | Ok |

| Sender | Recipient | Text |
|--------|-----------|------|
| JONES | HELMES | Yo I'm in room 104 |
| HELMES | JONES | Bet bro give me a sec and I'll pull up |
| JONES | HELMES | Soon as checks pull up u can come get money |
| JONES | HELMES | Oh for meek |

248.  Based on the context of these communications and others, I believe that HELMES advised that he collected the money for JONES, and agreed to deliver the cash to JONES at a hotel located in Eatontown, New Jersey, a location frequented by JONES.  Thereafter, JONES mistakenly sent HELMES a text message intended for "meek" indicating that as soon as "checks," which is HELMES' nickname, "pull up u can come get money."

249.  Then, at approximately 7:07 p.m., HELMES called JONES on the JONES 4363 Facility, who asked if HELMES wanted him to "walk through the cut," referring to a foot path behind the hotel that leads to a nearby apartment complex.  HELMES responded affirmatively.  JONES then asked, "How long?" HELMES responded, "I'll be there in like two minutes bro, I'm getting off, I'm getting off the P Way right now."  JONES replied, "Alright, bet."

250.  At approximately 7:15 p.m., law enforcement observed HELMES arrive at that apartment complex in the black Dodge Challenger.  At around the same time, law enforcement observed JONES exit the hotel, walk through the "cut" to HELMES' location, and conduct a hand-to-hand transaction with HELMES.  HELMES then departed the area in his vehicle as JONES returned to the Crystal Inn.

251.  On May 14, 2019, at approximately 10:48 p.m., JONES (using the JONES 4363 FACILITY) called HELMES and asked, "Where you at?"  HELMES responded that he was in "Asbury."  JONES then asked, "You good?"  HELMES responded affirmatively.  JONES then asked HELMES to "Come to Country Club."  HELMES responded, "Alright.  What's your number?"  JONES replied, "Five."  HELMES responded, "Alright, got you."

252.  Based on the context of this calls and others, I believe that JONES made arrangements to purchase "five," or 5 grams of cocaine or crack cocaine from HELMES.  HELMES agreed to the sale and to meet JONES for the transaction at "Country Club," likely a reference to the same apartment complex in Eatontown, New Jersey, where HELMES and JONES previously met on May 10, 2019.

253.  On July 13, 2019, between approximately 5:39 p.m. and approximately 6:28 p.m., HELMES and JONES (using the JONES 0236 Facility) exchanged the following text messages, among others:

| Sender | Recipient | Text |
|--------|-----------|------|
| JONES | HELMES | Yo bro hit me ASAP |
| JONES | HELMES | Yo bro u killing me now |
| JONES | HELMES | Bro U can bring it back I got a play |
| HELMES | JONES | heard you |
| HELMES | JONES | 34 left |
| JONES | HELMES | I told u my situation niggas calling me |
| HELMES | JONES | come 2 me |
| JONES | HELMES | Ok wya |

254.  At approximately 6:51 p.m., JONES (using the JONES 0236
Facility) called HELMES and stated, "I'm looking for you, like bro, like got
niggas calling my phone."  HELMES responded, "I'm sitting in the crib, I'm
waiting for her to come back, that's why I said, I said come to me."  JONES
replied, "Alright, I'm going to come there right now."  HELMES responded,
"Alright, come on."  Then, at approximately 7:32 p.m., JONES (using the
JONES 0236 Facility) called HELMES and advised, "I'm downstairs."  HELMES
responded, "I'll be right down."

255.  Based on these communications and others, I believe that JONES
contacted HELMES for the purpose of purchasing a quantity of cocaine or
crack cocaine from HELMES.  In his text messages to HELMES, JONES
explained that he had "a play" and that people were "calling" him, meaning that
JONES had customers lined up to purchase the narcotics he was attempting to
obtain from HELMES.  After receiving numerous text messages from JONES,
HELMES finally responded, beginning at around 5:55 p.m., acknowledging
JONES' text messages.  HELMES then sent JONES text messages advising that
he (HELMES) had "34 left," referring to 34 grams of cocaine or crack cocaine,
and that JONES would have to come to him for the transaction.  In the
subsequent call between HELMES and JONES at around 6:51 p.m., HELMES
advised JONES that he was "at the crib," meaning HELMES' residence at the
Glassworks apartment complex in Cliffwood, and that JONES would have to
come there to get the narcotics from HELMES.  The last call in this series
reveals that JONES arrived at HELMES' location and to meet with HELMES for
the transaction.

### *YARBROUGH*

256.  The investigation has revealed that YARBROUGH regularly
purchased quantities of cocaine and crack cocaine from HELMES in
furtherance of the conspiracy.  For instance, on July 14, 2019, at
approximately 2:58 p.m., YARBROUGH (using the YARBROUGH 2170 Facility)
called HELMES and asked if HELMES could "get to the Long Branch area, or
not?"  HELMES responded, "no" and advised that they could meet at "another
time" if YARBROUGH could not "get to" HELMES.  YARBROUGH asked if
HELMES was in Matawan.  HELMES responded affirmatively.

257.  Thereafter, between approximately 6:55 p.m. and approximately 6:57 p.m., HELMES and YARBROUGH (using the YARBROUGH 2170 Facility) exchanged the following text messages:

| Sender | Recipient | Text |
| --- | --- | --- |
| YARBROUGH | HELMES | Bro wat time u be back aroud ima have a ride set up |
| HELMES | YARBROUGH | now |
| YARBROUGH | HELMES | Ight where I'm going to matawan? |
| HELMES | YARBROUGH | Yes |
| YARBROUGH | HELMES | Ight I'm bout to be on my way n 10 mins |

258.  Then, at approximately 7:16 p.m., HELMES called YARBROUGH on the YARBROUGH 2170 Facility and asked, "Where you at?"  YARBROUGH responded, "I'm still in Long Branch ... I'm [unintelligible] you up now, I'm trying to see what you got."  HELMES replied, "Alright" and asked YARBROUGH, "What you wanted though?"  YARBROUGH responded, "Um, twelve."  HELMES replied, "Alright."

259.  Based on the context of these communications and others, I believe that YARBROUGH made arrangements to meet with HELMES for the purpose of purchasing "twelve," or 12 grams of cocaine or crack cocaine from HELMES.

260.  At approximately 7:32 p.m., YARBROUGH (using the YARBROUGH 2170 Facility) sent a text message to HELMES stating: "Split it 6 n 6 if u can."  Based on the context of this communication and others, I believe that YARBROUGH either wanted HELMES to package the 12 grams in two separate 6-gram baggies, or wanted HELMES to provide him with 6 grams of crack cocaine and 6 grams of powder cocaine.

261.  On July 22, 2019, at approximately 1:57 p.m., YARBROUGH (using the YARBROUGH 2170 Facility) called HELMES.  During this call, YARBROUGH told HELMES, "I got 650" and asked if he could "get fifteen and pay half now and pay half next time?"  HELMES responded affirmatively and inquired as to YARBROUGH's whereabouts.  YARBROUGH replied that he was in "Port Monmouth" at his "bitch house."  HELMES instructed YARBROUGH to "text me the address right now."  YARBROUGH responded, "Alright" and asked if HELMES was "going to come now?"  HELMES responded affirmatively.

262.  Based on the context of this call and others, I believe that YARBROUGH made arrangements to purchase 15 grams of crack cocaine from HELMES, and asked if he could just give HELMES half of the money now and pay HELMES the other half later.  HELMES agreed to the sale and to deliver the narcotics to YARBROUGH in Port Monmouth, New Jersey.

263.  At approximately 1:58 p.m., YARBROUGH (using the YARBROUGH 2170 Facility) sent HELMES a text message with a specific street address, followed by another text message stating, "Port Monmouth." Then, at approximately 2:38 p.m., HELMES called YARBROUGH on the YARBROUGH 2170 Facility and advised that he was "like two minutes away."

264.  At approximately 2:40 p.m., law enforcement observed HELMES arrive in front the Port Monmouth address that YARBROUGH had provided in the earlier text message. Approximately two minutes later, law enforcement observed an African American male subject, later identified as YARBROUGH, exit the Port Monmouth residence and get into the back seat of HELMES' vehicle. Approximately two minutes later, YARBROUGH exited HELMES' vehicle carrying a brown paper bag in his right hand and walked back inside the Port Monmouth residence.

265.  On July 23, 2019, at approximately 9:52 p.m., YARBROUGH (using the YARBROUGH 2170 Facility) called HELMES and asked, "You got three point five of soft?" HELMES responded, "Yeah, but you gotta come to me." HELMES then asked, "Where you at now?" YARBROUGH responded, "I'm in Port Monmouth" and advised HELMES "I'll probably get some other shit on top of it, I'm just trying to think how much I want." HELMES replied, "Alright, let me know."

266.  Approximately nine minutes later, at around 10:01 p.m., YARBROUGH (using the YARBROUGH 2170 Facility) called HELMES and stated, "Let me get three point five, and let me get, um, let me get ten." HELMES responded, "Alright, come on."

267.  Approximately one minute later, YARBROUGH (using the YARBROUGH 2170 Facility) called HELMES again and stated, "Make it fifteen, alright." HELMES responded, "Alright."

268.  Based on the context of these communications and others, I believe that YARBROUGH made arrangements to meet HELMES for the purpose of purchasing 3.5 grams of "soft," meaning powder cocaine, and 15 grams of crack cocaine from HELMES.

269.  Then, at approximately 10:29 p.m., YARBROUGH (using the YARBROUGH 6880 Facility) called HELMES and advised, "I'm here my man." HELMES responded, "Give me like two minutes."

270.  On August 5, 2019, at around 1:39 p.m., HELMES received a text message from YARBROUGH (using the YARBROUGH 6880 Facility), stating: "Its e bro call this phone no Wi-Fi going to get my phone fixed m."

Approximately eight minutes later, YARBROUGH sent another text message to HELMES stating, "Can come to you."

271.    Then, at approximately 1:59 p.m., HELMES called YARBROUGH on the YARBROUGH 6880 Facility and asked, "What you wanted?" YARBROUGH responded, "five." YARBROUGH advised that he was "coming back to Keansburg right now," and asked HELMES, "Where you want me to meet you?" HELMES responded, "I'm in the Burg," meaning Keansburg. YARBROUGH replied, "Alright.  I'm going to come now."

272.    Based on the context of these communications and others, I believe that YARBROUGH made arrangements to meet with HELMES in Keansburg for the purpose of purchasing 5 grams of crack cocaine from HELMES.

273.    At approximately 2:19 p.m., HELMES called YARBROUGH on the YARBROUGH 6880 Facility.  During this call, YARBROUGH advised that he was "coming down Carr" and would be "there" shortly.  HELMES responded that he was "on Seabreeze over by Carr Avenue, so if you come down Seabreeze you'll see me." HELMES then advised YARBROUGH, "You can't turn on Seabreeze from Carr, you gotta come around, remember it's a one-way right there." YARBROUGH responded, "Alright, alright, I got you."

274.    Approximately one minute later, at around 2:20 p.m., law enforcement observed YARBROUGH arrive on Seabreeze Avenue in Keansburg in the passenger seat of a vehicle operated by a female.  YARBROUGH's vehicle pulled up next to HELMES on Seabreeze Avenue, at which time HELMES and YARBROUGH conducted a hand-to-hand transaction.

### HILL

275.    The investigation has revealed that HILL purchased quantities of cocaine and crack cocaine from HELMES for redistribution.  For instance, on July 6, 2019, at approximately 12:28 p.m., HILL called HELMES and stated that he was in Lakewood, and that he needed "the other form." HELMES clarified and asked if HILL was talking about "undone," meaning powder cocaine, and HILL responded affirmatively.  HELMES then asked, "How many?" HILL responded that he needed "five of 'em," meaning 5 grams.  HELMES instructed HILL to come to Neptune.  HILL responded, "I'm on my way right now."

276.    Thereafter, at approximately 1:51 p.m., HELMES called HILL, who inquired as to HELMES' location.  HELMES responded that he was going to "pull up on" Ridge Avenue in Asbury Park, New Jersey.  HILL advised that he would be there in three or four minutes.

277.  On July 7, 2019, at approximately 9:42 p.m., HILL called HELMES.  During this call, HILL advised HELMES that he was in Lakewood and that he needed "20," and asked if HELMES would come to him.  HELMES replied that he was in "Matawan" and had "no ride."  HILL then said that he would order "25," but HELMES again explained that he had "no ride."  HILL then advised HELMES that he was going to come to HELMES to "get that."

278.  Thereafter, at approximately 11:15 p.m., HELMES called HILL and inquired as to HILL's location.  HILL advised that he was "about to jump on the Parkway" and that he would be there in "like half an hour."  HELMES acknowledged and instructed HILL to "call me when you passing Asbury."  HILL responded, "Alright."

279.  Approximately thirty minutes later, HELMES called HILL, who advised that he would be there in approximately ten minutes.  Approximately five minutes later, at around 11:50 p.m., HILL called HELMES and asked if HELMES was at the "Double Tree."  HELMES responded, "Nah, the one right next to it.  Sunrise."  After an extended pause, HELMES asked HILL, "You see me already?"  HILL responded "No ... I'm coming out of the Double Tree right now" and then mentioned something about the "Red Roof."  HELMES explained that "It's before the Red Roof.  Where you turn in like you're going to the Red Roof, it's the one right in front.  Red Roof is pushed to the back."  HILL acknowledged.  HELMES then stated, "My lights is on.  If that's you turnin' in ... I'm parked with my lights on."  HILL then stated "right there," at which time HELMES responded, "Yeah, I see you ... make the left ... make a right I mean."

280.  Based on the context of these communications and others, I believe that HILL ordered 25 grams of crack cocaine from HELMES and later met HELMES in the parking lot of a hotel located on Hope Road in Tinton Falls, New Jersey, just off Exit 105 of the Garden State Parkway.

### GATSON

281.  The investigation has revealed that GATSON frequently purchased quantities of cocaine or crack cocaine from HELMES.  For instance, on May 25, 2019, between approximately 9:56 a.m. and approximately 11:31 a.m., HELMES exchanged the following text messages with GATSON:

| Sender | Recipient | Text |
|--------|-----------|------|
| HELMES | GATSON | Need me before I slide |
| GATSON | HELMES | 5pc |
| HELMES | GATSON | Bet |
| HELMES | GATSON | 10 mins cuz |
| GATSON | HELMES | Thought u forgot I dam sure did |

282.   Based on the context of these communications and others, I believe that GATSON made arrangements to purchase a "5pc," meaning 5 grams of cocaine or crack cocaine, from HELMES.  Approximately ninety minutes later, HELMES contacted GATSON to let him know that HELMES would be ready for the transaction in ten minutes.

283.   On June 10, 2019, beginning at approximately 9:33 p.m., HELMES and GATSON exchanged the following text messages:

| Sender | Recipient | Text |
| --- | --- | --- |
| GATSON | HELMES | U out here |
| HELMES | GATSON | Omw |
| GATSON | HELMES | Sev |
| GATSON | HELMES | Ayyy bruhhh It's easy to say Next day |

284.   The next morning, June 11, 2019, at around 1:00 a.m., HELMES sent a text message to GATSON stating: "Fell asleep cuz."

285.   Based on these communications and others, I believe that GATSON made arrangements to purchase 7 grams of cocaine or crack cocaine from HELMES.  HELMES, however, fell asleep before meeting with GATSON that night.

286.   Later that same morning, at approximately 10:07 a.m., HELMES called GATSON, who inquired as to HELMES' location.  HELMES responded, "I'm home."  GATSON replied, "Oh, you out here … I might do what I did before and walk over there."  HELMES responded, "I might jump and meet you halfway."  GATSON replied, "Through the path, that'll work."  HELMES responded, "I don't know the path though."  GATSON explained, "Soon as you walk across the street, go straight down that little path that's right next to the park, you was in the park, that path is on the back side of the park."  HELMES responded, "Alright [unintelligible] right now."  GATSON replied, "You going to start, alright, let me get my shoes on then cause I'm outside in my slippers.  I'll be right there."

287.   At approximately 10:22 a.m., GATSON sent a text message to HELMES stating: "Walking thru."  Less than a minute later, HELMES called GATSON and advised, "I'm looking at the train tracks, a fence, and like a little path."  GATSON responded, "That's the strip … that's right where we gonna meet face-to-face."  HELMES replied, "It's a walk-way path."  GATSON responded, "Come right in that bitch."  HELMES stated, "Alright."

288.   Based on the context of these communications and others, I believe that GATSON and HELMES met, for the transaction they arranged the previous night, on a "path" behind the "park" located near HELMES' residence. In fact, at approximately 10:33 a.m., law enforcement observed HELMES

walking through a trail behind a park adjacent to the Glassworks apartment complex.

289.   On July 29, 2019, between approximately 8:10 a.m. and approximately 9:47 a.m., HELMES and GATSON exchanged the following text messages:

| Sender | Recipient | Text |
|--------|-----------|------|
| GATSON | HELMES | Wut up |
| HELMES | GATSON | need me |
| GATSON | HELMES | U ovr thr |
| HELMES | GATSON | yup |
| HELMES | GATSON | 10? |
| GATSON | HELMES | Tru 3 mins |

290.   Then, at approximately 9:51 a.m., HELMES called GATSON, who advised, "I'm close to you, I'm walking."  HELMES responded, "Alright" and advised GATSON, "Give me like two minutes, let me throw my pants on." GATSON replied, "Alright, well, by the time you get out there I should be just walking up on that parking lot, if that's where you going to be at."  HELMES responded, "Alright, yep."

291.   Based on the context of these communications and others, I believe that GATSON contacted HELMES and made arrangements to purchase 10 grams of cocaine or crack cocaine from HELMES.  In the subsequent call, GATSON advised HELMES that he was walking to HELMES' location and would be in "that parking lot," referring to the parking lot of the Glassworks apartment complex in Cliffwood, in approximately two minutes if HELMES wanted to meet him there.  HELMES responded affirmatively and agreed to meet GATSON in approximately two minutes.